IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE ELLIS, ET AL.,<br><br>Plaintiffs,<br><br>v.<br><br>JACK HOUSENGER, et al.,<br><br>Defendants,<br><br>and<br><br>BAYER CROPSCIENCE, LP, et al.,<br><br>Defendant-Intervenors. | Case No. 13-cv-01266-MMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; DIRECTIONS TO PARTIES** |

Before the Court are three motions:  (1) "Motion for Summary Judgment," filed April 14, 2016, by plaintiffs Steve Ellis, Tom Theobald, Jim Doan, Bill Rhodes, Center for Food Safety, Beyond Pesticides, Sierra Club and Center for Environmental Health; (2) "Cross-Motion for Summary Judgment," filed June 7, 2016, by defendants Gina McCarthy, Administrator of the United States Environmental Protection Agency, and Jack Housenger, Director of the Office of Pesticide Programs of EPA (collectively, "EPA"); and (3) "Cross-Motion for Summary Judgment," filed June 20, 2016, by defendant-intervenors Bayer CropScience LP, Syngenta Crop Protection, LLC, Valent U.S.A. Corporation, and CropLife America (collectively, "Intervenors").  The motions have been fully briefed. Having read and considered the papers filed in support of and in opposition to the motions, the Court hereby rules as follows.[1]

_____

[1]By order filed October 25, 2016, the Court took the matters under submission.

United States District Court<br>Northern District of California

## BACKGROUND

By the instant action, plaintiffs, comprising four individuals and four public interest groups, "challenge the actions of [the EPA] to allow the ongoing use of pesticide products containing the active ingredients clothianidin and thiamethoxam." (See Second Amended Complaint ("SAC") ¶ 1.) Plaintiffs allege the subject pesticides "have been shown to adversely impact the survival, growth, and health of honey bees and other pollinators vital to U.S. agriculture" and have "harmful effects on other animals, including threatened and endangered species." (See SAC ¶ 2.)

More specifically, plaintiffs allege that the EPA failed to comply with the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") by denying plaintiffs' request, made in a petition submitted to the EPA, to suspend the registration of products containing clothianidin (see SAC ¶¶ 82, 104, 110), and by approving applications to register certain products containing clothianidin or thiamethoxam without first providing notice in the Federal Register (see SAC ¶¶ 37, 114, 121). Additionally, plaintiffs allege that the EPA violated the Endangered Species Act ("ESA") by failing to consult with the Fish and Wildlife Service ("FWS") prior to approving certain applications to register products containing clothianidin and thiamethoxam. (See SAC ¶¶ 49-50, 128, 132.)

## LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).

The Supreme Court's 1986 "trilogy" of Celotex Corp. v. Catrett, 477 U.S. 317 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), requires that a party seeking summary judgment show the absence of a genuine issue of material fact. Once the moving party has done so, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on

1   file, designate specific facts showing that there is a genuine issue for trial." See Celotex,

2   477 U.S. at 324 (internal quotation and citation omitted). "When the moving party has

3   carried its burden under Rule 56[ ], its opponent must do more than simply show that

4   there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

5   "If the [opposing party's] evidence is merely colorable, or is not significantly probative,

6   summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations

7   omitted). "[I]nferences to be drawn from the underlying facts," however, "must be viewed

8   in the light most favorable to the party opposing the motion." See Matsushita, 475 U.S. at

9   587 (internal quotation and citation omitted).

## DISCUSSION

11      All parties seek summary judgment on the issue of liability as to the six claims

12  alleged in the SAC.[2]

### A. First and Second Claims

14      The First and Second Claims challenge the EPA's denial of a request made in a

15  petition that was submitted to the EPA by four of the plaintiffs, specifically, a request to

16  immediately suspend the registration of products containing clothianidin.

### 1. Applicable Statutory and Regulatory Framework

18      Under FIFRA, no pesticide may be distributed or sold unless it has been registered

19  by the EPA. See 7 U.S.C. § 136a(a). If, after the EPA registers a pesticide, it "appears

20  to the [EPA] that a pesticide . . . generally causes unreasonable adverse effects on the

21  environment," the EPA may issue a notice of intention "to cancel its registration or to

22  change its classification." See 7 U.S.C. § 136d(b). If the EPA issues a notice of intention

23  to cancel or change the classification of a registration, "a person adversely affected by

24  the notice" may request a hearing, see 7 U.S.C. § 136d(b)(2), which hearing is conducted

25  _____

26      [2]In their cross-motion for summary judgment, the Intervenors join in the EPA's
    cross-motion for summary judgment (see Intervenors' Cross-Mot. at 1:2-3); accordingly,
27  the Court's rulings on the arguments made by the EPA pertain equally to the Intervenors.
    Where the Intervenors have made arguments in addition to those made by the EPA, the
28  Court has separately addressed those arguments herein.

by an administrative law judge, <u>see</u> 40 C.F.R. § 164.20(c).  "[C]ancellation or reclassification proceedings may take one or two years to complete."  <u>Love v. Thomas</u>, 858 F.2d 1347, 1350 (9th Cir. 1988), <u>cert. denied</u>, 490 U.S. 1035 (1989)

"If the [EPA] determines that action is necessary to prevent an imminent hazard during the time required for cancellation or change in classification proceedings, the [EPA] may, by order, suspend the registration of the pesticide immediately."  7 U.S.C. § 136d(c)(1).  The term "imminent hazard" is defined as "a situation which exists when the continued use of a pesticide during the time required for [a] cancellation proceeding would be likely to result in unreasonable adverse effects on the environment or will involve unreasonable hazard to the survival of a species declared endangered or threatened."  <u>See</u> 7 U.S.C. § 136(l).  The term "unreasonable adverse effects on the environment" is defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide."  <u>See</u> 7 U.S.C. § 136(bb).

Subject to one exception, discussed below, the EPA may not issue an order of suspension unless it has "issued, or at the same time issues, a notice of intention to cancel the registration or change the classification of the pesticide" and "notif[ies] the registrant prior to issuing any suspension order."  <u>See</u> 7 U.S.C. § 136d(c)(1).  If the registrant does not request a hearing within five days, the "suspension order may be issued and shall take effect."  <u>See</u> 7 U.S.C. § 136d(c)(2).  If the registrant timely requests a hearing, the EPA conducts an "expedited hearing . . . on the question of whether an imminent hazard exists."  <u>See</u> 7 U.S.C. §§ 136d(c)(1).  Following the expedited hearing, the EPA "shall issue a final decision and order" addressing the issue of suspension.  <u>See</u> 40 C.F.R. § 164.122(a).  The "administrative suspension process" may take three to four months to complete.  See <u>Dow Chemical Co. v. Blum</u>, 469 F. Supp. 892, 899, 902 (E.D. Mich. 1979); <u>see also</u> <u>Love</u>, 858 F.2d at 1353 n.10 (noting "suspension hearing would require approximately four months").

//

4

The one instance in which the EPA may suspend a registration prior to issuing a notice of intention to cancel and prior to notifying the registrant is where "the [EPA] determines that an emergency exists that does not permit the [EPA] to hold a hearing before suspending." See 7 U.S.C. § 136d(c)(3). Upon issuing an "emergency" order of suspension, see 40 C.F.R. § 164.123(a), the EPA must, however, "immediately notify the registrant," who, in turn, may request an expedited hearing on the question of whether an imminent hazard exists, see 40 C.F.R. § 164.123(b). Such "emergency order" of suspension remains in place pending the conclusion of the administrative suspension process. See 7 C.F.R. § 136d(c)(3); 40 C.F.R. § 164.123(b); see also National Coalition Against the Misuse of Pesticides v. EPA, 867 F.2d 636, 644 (D.C. Cir. 1989) (holding "[t]he extraordinary step of emergency suspension is available only if the requisite unreasonable harm would be likely to materialize during the pendency of ordinary suspension proceedings").

**2. Administrative Proceedings Conducted on Plaintiffs' Petition**

On March 20, 2012, plaintiffs Steve Ellis, Tom Theobald, the Center For Food Safety, and Beyond Pesticides, along with other individuals and entities who are not parties to the instant action, jointly submitted to the EPA an "Emergency Citizen Petition" ("Petition"). (See Administrative Record ("AR") 44323-44370.) In the Petition, plaintiffs requested that the EPA, inter alia, suspend clothianidin's registration "on an emergency basis," or, alternatively, "promptly initiate Special Review and cancellation procedures for clothianidin pursuant to 7 U.S.C. § 136d[,] and then suspend its registration pending completion of the cancellation procedures based on the ongoing and imminent harm posed." (See AR 44327.)[3] Thereafter, in support of the Petition, plaintiffs submitted

_____

[3] The EPA may institute a "Special Review" to "help the [EPA] determine whether to initiate procedures to cancel . . . or reclassify registration of a pesticide product." See 40 C.F.R. § 154.1(a). The EPA may initiate a Special Review "on [its] own initiative" or "at the suggestion of any interested party" who submits a "petition[ ] to begin the Special Review process." See 40 C.F.R. § 154.10; see also 40 C.F.R. § 154.7 (identifying "criteria for initiation of Special Review"). During the Special Review process, the EPA creates a "docket," provides an opportunity for the registrant and others to submit comments, and conducts, if it deems such proceedings appropriate, "informal public

supplemental filings dated, respectively, May 3, 2012, and June 18, 2012.  (See AR 44598-618.)

On July 17, 2012, the EPA issued a responsive letter, denominated a "partial response" ("Partial Response").  (See AR 44419-30.)  The EPA explained therein that it was posting on its website for public comment "the [P]etition (including the [P]etition exhibits and supplemental filings)," its Partial Response thereto (see AR 44419), and "additional materials from other sources" (see AR 44420).  The EPA then denied the request for an emergency order of suspension and stated it would respond to the other requests made in the Petition "[a]fter reviewing the public comments submitted."  (See AR 44419.)

In denying an immediate suspension, the EPA found the Petition suffered from a "facial inadequacy," specifically, the lack of "an explanation as to how the harm identified outweigh[ed] the benefits to growers and the agricultural economy from the use of the pesticide" (see AR 44423-24), and that, in any event, "nowhere in the [P]etition [did] [plaintiffs] explain how the use of clothianidin rises to the level of the FIFRA imminent hazard standard" (see AR 44424; see also AR 44425-30).[4]  In setting forth said findings, the EPA stated that, "due to the emergency nature of [the] request," it had only considered the materials "received prior to May 4, 2012" (see AR 44420), and that it would consider plaintiffs' supplemental filings, namely, those dated May 3, 2012, and June 18, 2012, along with the "additional materials from other sources," once it had received the public comments, and thereafter would determine whether reconsideration was warranted (see AR 44419).[5]

---

hearings."  See 40 C.F.R. §§ 154.15, 154.26, 154.29.  At the conclusion of a Special Review, the EPA may, inter alia, issue notice of its intention to cancel a registration or to change the classification of a registration.  See 40 C.F.R. § 154.33(a).

[4]With respect to the latter basis for its denial, the EPA attached to the Partial Response a 30-page "Technical Support Document" in which it set forth a detailed analysis of the studies cited in the Petition.  (See AR 44431-60.)

[5]The administrative record does not indicate whether, and if so when, the EPA ruled on the remaining requests in the Petition.

### 3. Merits of First and Second Claims

In the First Claim, plaintiffs allege it was "arbitrary and capricious" for the EPA, when ruling on plaintiffs' request for an immediate suspension, not to consider plaintiffs' "supplemental filings." (See SAC ¶ 104.) In the Second Claim, plaintiffs allege the "EPA's failure to suspend the registrations of [clothianidin] products in view of their unreasonable adverse effects violates FIFRA." (See SAC ¶ 110.)

District courts have jurisdiction to review "the refusal of the [EPA] to cancel or suspend a registration or change a classification not following a hearing." See 7 U.S.C. § 136n(a). Where a federal statute providing for judicial review of an agency's action does not itself provide a standard of review, the "general standard of review of agency action established in the Administrative Procedure Act ('APA')" applies. See Oregon Natural Resources Council v. Allen, 476 F.3d 1031, 1036 (2007). Here, FIFRA does not provide a standard of review for the denial of a request to immediately suspend a pesticide product, and, consequently, the standard set forth in the APA applies. Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See 5 U.S.C. § 706(2). A plaintiff has the burden to show the agency's decision was improper, and, "[a]bsent a showing of arbitrary action, [courts] must assume that the [agency has] exercised [its] discretion appropriately." See Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976).

### a. Imminent Hazard: Harm to Endangered/Threatened Species

As discussed above, the EPA has the authority to immediately suspend the registration of a pesticide "to prevent an imminent hazard." See 7 U.S.C. § 136d(c)(1). An "imminent hazard" is "a situation which exists when the continued use of a pesticide during the time required for [a] cancellation proceeding [1] would be likely to result in unreasonable adverse effects on the environment or [2] will involve unreasonable hazard to the survival of a species declared endangered or threatened . . . pursuant to the [ESA]." See 7 U.S.C. § 136(l).

Plaintiffs argue the denial of their request for an immediate suspension was arbitrary and capricious for the reason that the Partial Response did not address the second of the two alternative definitions of "imminent hazard," specifically, whether continued use of clothianidin would "involve unreasonable hazard to the survival of a species declared endangered or threatened." See id.

In their Petition, plaintiffs cited to studies, articles and other publications addressing whether clothianidin causes harm to bees. Plaintiffs did not, however, cite to a study or article, or otherwise reference any evidence, to show the continued use of clothianidin would pose an unreasonable hazard to the survival of an endangered or threatened species.[6] Plaintiffs argue that the EPA nonetheless was required to address the second of the two alternative definitions of imminent harm. As the Petition referenced no evidence that could support such a finding, plaintiffs are arguing, in essence, that the EPA was itself required to locate any evidence that might support a showing that continued use of clothianidin would pose an unreasonable hazard to the survival of an endangered or threatened species and then to determine whether such evidence would suffice to support an immediate suspension.

The issue presented is one of burden. Neither FIFRA nor its implementing regulations directly address the showing a party must make when it requests that the EPA immediately suspend the registration of a pesticide product on account of an asserted imminent hazard. As the EPA points out, however, the Code of Federal Regulations does provide that, at a contested hearing on the issue of whether an order of immediate suspension is proper, although "the ultimate burden of persuasion shall rest with the proponent of the registration," the "proponent of suspension shall have the burden of going forward to present an affirmative case for the suspension." See 40

---

[6]Although the Petition did state that "[n]umerous native Federally-listed insects may be directly impacted and non-insect species, such as insectivorous birds, may be indirectly affected [by clothianidin]" (see AR 44328), plaintiffs cited no evidence in support of such assertion.

C.F.R. § 164.121(g). The Court finds the principle underlying said regulation, specifically, that the party who proposes a suspension bears the initial burden of coming forward with evidence in support thereof, is properly applied to any procedure by which a party seeks an immediate suspension.[7]

As plaintiffs' Petition did not identify any evidence that might show an imminent hazard existed under the second of the two statutory definitions, plaintiffs did not meet their initial burden of presenting an "affirmative case," see 40 C.F.R. § 164.121(g), for the suspension. Under such circumstances, the Court finds plaintiffs have not met their burden to show the EPA acted arbitrarily and capriciously when it did not address in the Partial Response whether an immediate suspension was necessary to prevent an unreasonable hazard to the survival of an endangered or threatened species.

### b. Imminent Harm: Unreasonable Adverse Effects on Environment

Plaintiffs also argue that the EPA's failure to immediately suspend the petition, under the "unreasonable adverse effects on the environment" definition of "imminent harm," see 7 U.S.C. § 136(l), was arbitrary and capricious.

As noted above, the term "unreasonable adverse effects on the environment" is defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." See 7 U.S.C. § 136(bb). "[T]he statute thus requires the EPA to consider the benefits as well as the risks of its use, including the economic consequences of suspension." See Love, 858 F.2d at 1357; see also id. at 1350, 1358, 1361-62 (holding, although evidence supported EPA's finding that challenged pesticide "may cause serious health risks to persons exposed to it, including sterility in men and birth defects in the unborn children of

_____

[7]Although, as the Supreme Court has observed, "the ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary," see Campbell v. United States, 365 U.S. 85, 96 (1961), plaintiffs did not assert during the administrative process and have not argued in the instant action that the facts pertinent to any effects clothianidin might have on endangered or threatened species are peculiarly within the knowledge of the EPA.

pregnant women," issuing order of immediate suspension was "arbitrary and capricious" where EPA had not balanced risk of such harm against "economic impact of suspension").

Here, plaintiffs argue, the denial was arbitrary and capricious for the asserted reason that the "EPA failed to assess any alleged benefits from clothianidin's continued use." (See Pls.' Mot. at 30:8.) As noted above, the EPA found plaintiffs' request for an immediate suspension to be facially inadequate as it did not include "an explanation as to how the harm identified outweighs the benefits to growers and the agricultural economy from the use of the pesticide." (See AR 44423-24; see also AR 44429.) As the Petition in fact included no such explanation, the issue presented is, again, one of burden.

In that regard, plaintiffs cite no authority to support their implicit argument that where a party seeks an immediate suspension under the first of the two alternative definitions of imminent harm, such party, to meet its initial burden, need do no more than identify a harm,[8] and, for the reasons discussed above, the Court finds a petitioner who proposes an immediate suspension bears the initial burden of making an "affirmative case" for such relief. See 40 C.F.R. § 164.121(g). As the Petition lacked any showing that the asserted harm outweighed the pesticide's benefits, plaintiffs did not meet their initial burden of presenting a case for an immediate suspension.[9]

Under such circumstances, the Court finds plaintiffs have not met their burden to show the EPA, based on a finding of facial inadequacy, acted arbitrarily and capriciously

_____

[8]Plaintiffs rely on two cases holding the EPA, before suspending a pesticide registration, must consider both "benefits" and "risks." See Love, 858 F.2d at 1357; Environmental Defense Fund, Inc. v. EPA, 465 F.2d 528 (D.C. Cir. 1972). The cited cases, however, do not address the burden placed on a party petitioning the EPA for a suspension. In one of the cases, the EPA issued the suspension order on its own initiative, see Love, 858 F.2d at 1350-51, and, in the other, the party petitioning for a suspension did offer evidence it contended showed the harm outweighed the benefits, see Environmental Defense Fund, 465 F.2d at 539 (noting petitioner's "submission" to EPA showing "alternative pest control mechanisms [were] available").

[9]Plaintiffs did not assert during the administrative process and have not argued in the instant action that facts pertinent to balancing the risks and benefits of clothianidin are peculiarly within the knowledge of the EPA.

in denying the request for an immediate suspension.[10]

### c. Supplemental Filings

As noted above, the EPA did not consider, at the time it issued the Partial Response, two supplemental filings plaintiffs had submitted to the EPA in support of the Petition. Rather, as also noted, the EPA indicated it would consider those submissions later in the administrative proceedings, specifically, after it had reviewed public comments received in response to the Petition.

Under the APA, "due account shall be taken of the rule of prejudicial error," see 5 U.S.C. § 706; in other words, to be entitled to an order setting aside an agency decision due to an error on the part of that agency, the plaintiff must show such error "was harmful," see Shinseki v. Sanders, 556 U.S. 396, 406, 409-10 (2009) (holding § 706 is codification of "harmless error rule"). Here, even assuming the EPA acted arbitrarily in not considering plaintiffs' supplemental filings before it denied the request for an immediate suspension, plaintiffs suffered no prejudice thereby, as none of the supplemental filings addressed whether a suspension was necessary to prevent an unreasonable hazard to the survival of a species declared endangered or threatened under the ESA or whether the economic, social, and environmental benefits of clothianidin were outweighed by the risks of its continued use.

Accordingly, plaintiffs have not shown they are entitled to relief based on the EPA's determination not to review plaintiffs' supplemental filings prior to ruling on the request for an immediate suspension.

### B. Third and Fourth Claims

In the Third Claim, titled "EPA's Failure to Publish Notices of Pesticide Applications for Clothianidin Products Violated FIFRA and the APA," plaintiffs allege the

---

[10]Plaintiffs also challenge as arbitrary and capricious the EPA's denial to the extent the EPA relied on the additional ground that plaintiffs had not shown a "substantial likelihood of serious imminent harm." (See AR 44424.) The Court has not considered herein such claimed error as, for the reasons stated above, plaintiffs have not shown the EPA acted arbitrarily and capriciously in finding the Petition was facially inadequate.

EPA registered seven products containing clothianidin without first providing in the Federal Register notice of the applications to register such products, and that, when the EPA approved said applications, it approved "new uses" for clothianidin, e.g., for use on lawns. (See SAC ¶¶ 114-16.)[11]  In the similarly titled Fourth Claim, plaintiffs allege the EPA registered nineteen products containing thiamethoxam without first providing in the Federal Register notice of the applications to register those products, and, that when the EPA approved said applications, it approved "new uses" for thiamethoxam, e.g., for use on apples. (See SAC ¶¶ 121-23.)[12]  Plaintiffs argue that, in light of the alleged failures by the EPA to provide notice to the public prior to registering the subject products, plaintiffs are entitled to an order vacating the subject registrations. (See SAC ¶ 137.)

### 1. Applicable Statutory and Regulatory Framework

As noted, no pesticide may be distributed or sold, unless the pesticide has been registered by the EPA. See 7 U.S.C. § 136a(a).  To register a pesticide, an applicant must file with the EPA an application that includes certain information, such as "the complete formula of the pesticide" and "a request that the pesticide be classified for general use or for restricted use, or for both." See 7 U.S.C. § 136a(c)(1).  The EPA "shall publish in the Federal Register . . . a notice of each application for registration of any pesticide if it contains any new ingredient," see 7 U.S.C § 136a(c)(4), or, alternatively, "if it would entail a changed use pattern," see id., which alternative pertains when the application "proposes a new use" for the pesticide, see 40 C.F.R. § 152.102.  When it publishes such a notice in the Federal Register, the EPA must "provide for a period of 30 days in which any Federal agency or any other interested person may comment," see 7

---

[11]Although the SAC alleges the EPA, without notice to the public, approved twenty-four applications that sought new uses for clothianidin (see SAC ¶¶ 114-16), plaintiffs clarify in their motion for summary judgment that only seven product registrations are challenged by the Third Claim (see Wu Decl., filed April 14, 2016, Ex. V).

[12]Although the SAC alleges the EPA, without notice to the public, approved forty-one applications that sought new uses for thiamethoxam (see SAC ¶¶ 121-23), plaintiffs clarify in their motion for summary judgment that only nineteen product registrations are challenged by the Fourth Claim (see Wu Decl., filed April 14, 2016, Ex. V).

U.S.C. § 136a(c)(4), and, in the event the EPA subsequently grants the application, it must "issue in the Federal Register a notice of issuance" and, inter alia, must "respond [therein] to comments received on the notice of application," see 40 C.F.R. § 152.102.

### 2. Standing

At the outset, the EPA challenges plaintiffs' standing to bring the Third and Fourth Claims.

"To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Citizens for Better Forestry v. U.S. Dep't of Agriculture, 341 F.3d 961, 969 (9th Cir. 2003) (internal quotation and citation omitted). Where, as here, a plaintiff asserts a "procedural injury," see id. at 969-70 (holding complaint alleging agency failed to provide "public notice" of proposed action and to "solicit appropriate information from the public" asserted "procedural injury"), such plaintiff establishes an injury in fact by showing "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing," see Cantrell v. City of Long Beach, 241 F.3d 674, 679 (9th Cir. 2001) (internal quotation and citation omitted), and establishes causation and redressibility by showing the asserted procedural right, "if exercised, could protect [his] concrete interests," see Defenders of Wildlife v. EPA, 420 F.3d 946, 957 (9th Cir. 2005) (emphasis omitted), rev'd on other grounds, Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644 (2007).

In its cross-motion for summary judgment, the EPA first notes that plaintiffs' motion for summary judgment does not address plaintiffs' standing to bring the Third and Fourth Claims. Under such circumstances, the EPA argues, the EPA is entitled to summary judgment on the Third and Fourth Claims "because [p]laintiffs are now precluded from submitting new arguments and evidence with their reply brief." (See EPA's Cross-Mot. at

5:12-14.)  The Court disagrees.

The purpose of the general rule against a moving party's making new arguments in a reply is to avoid putting the non-moving party in a position where he/she is deprived of an opportunity to respond.  Here, however, the EPA has not been deprived of such an opportunity.  Indeed, the Supreme Court has observed that, where, as here, the issue of standing is raised in a motion for summary judgment filed by the defendant, the plaintiff, in its opposition, may offer evidence to establish its standing at that time.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992).  In opposing the EPA's cross-motion, plaintiffs have offered evidence they argue supports their standing to bring the Third and Fourth Claims, thus affording the EPA an opportunity to respond thereto in its reply.

Accordingly, the Court finds the EPA is not entitled to summary judgment on the above-discussed procedural ground.

In their respective replies, neither the EPA nor the Intervenors challenge plaintiffs' evidentiary showing as to standing with respect to the Third and Fourth Claims.  The Court nonetheless finds it appropriate to consider the issue.  See D'Lil v. Best Western Encina Lodge & Suites, 538 F.3d 1031, 1035 (9th Cir. 2008) (holding "[a] district court [has] the authority to raise the issue [of standing] sua sponte").

Plaintiffs rely on declarations from plaintiffs Steve Ellis, Tom Theobald, Jim Doan and Bill Rhodes, the individuals identified in the SAC as "Beekeeper and Honey Producer Plaintiffs."  (See SAC ¶ 15.)  Each of these four plaintiffs avers he owns and operates a beekeeping company, that large numbers of his bees have been killed due to what he believes was the bees' exposure to clothianidin and thiamethoxam, that he has incurred economic loss due to the deaths of his bees, and that his remaining bees forage on the types of crops, trees and other plants on which the products allegedly approved without notice are to be used, e.g., "lawns" and "apples."  (See Ellis Decl. ¶¶ 2-6, 11, 13, 15; Theobald Decl. ¶¶ 2-5, 13-14, 17; Doan Decl. ¶¶ 2-6, 12, 16-17; Rhodes Decl. ¶¶ 2-4, 10, 15.)  Each such plaintiff also avers that, had the EPA provided notice to the public of the challenged applications, he would have submitted comments to the EPA.  (See Ellis Decl.

¶ 11; Theobald Decl. ¶ 19; Doan Decl. ¶ 18; Rhodes Decl. ¶ 16.)

The Court finds the above-referenced plaintiffs, in their respective declarations, have sufficiently demonstrated they have an economic interest in their respective businesses that may be adversely affected by use of clothianidin and thiamethoxam, which pesticides the EPA has acknowledged are "toxic to honey bees" (see AR 43254, 43634, 43748), and that said plaintiffs would have submitted comments to the EPA had they been afforded the opportunity to do so. See Summers v. Earth Island Institute, 555 U.S. 488, 497 (2009) (holding plaintiff who asserted cognizable interest in area affected by agency action had standing to challenge failure to provide notice of agency action that could adversely affect his interest "despite the possibility" that plaintiff's "right to comment would not be successful in persuading [the agency] to avoid impairment of [plaintiff's] concrete interests"); Citizens for Better Forestry, 341 F.3d at 971-72 (holding plaintiffs, who had aesthetic and recreational interests in forests, were injured by government's failure to afford them opportunity to be heard prior to its taking action with respect to forests; explaining, "the harm consists of added risk to the environment that takes place when government decisionmakers make up their minds without having before them an analysis (with public comment) on the likely effects on their decision on the environment") (internal quotation and citation omitted).

Accordingly, the Court finds plaintiffs Steve Ellis, Tom Theobald, Jim Doan and Bill Rhodes have standing to assert the Third and Fourth Claims. [13]

//

//

---

[13]In light of the Court's finding that the above-referenced four plaintiffs have standing to assert the Third and Fourth Claims, the Court does not consider herein whether other declarants, who are members of the organizational plaintiffs and who aver they were denied an opportunity to submit comments in response to the subject applications (see Carman Decl. ¶¶ 7, 19-23; Cox Decl. ¶¶ 2, 10-11; Feldman Decl. ¶¶ 2, 15-19; Kimbrell Decl. ¶¶ 2, 12-14, 16), also have standing. See Carey v. Population Services Int'l, 431 U.S. 678, 682 (1977) (holding that when court finds one plaintiff has standing to bring claim, it has "no occasion" to determine if other plaintiffs have standing).

United States District Court
Northern District of California

### 3. Merits

The alleged procedural deficiency on which plaintiffs base the Third and Fourth Claims is that, without first affording notice to the public and an opportunity for the public to be heard, the EPA registered products containing clothianidin and thiamethoxam for new uses.

The EPA argues it is entitled to judgment, on the asserted ground that when it registered the subject products, it did not approve a new use. In support of its argument, the EPA cites to evidence in the administrative record that, with respect to each registration challenged in the Third and Fourth Claims, shows the use or uses for which the EPA gave its approval were uses for which the EPA had previously given approval when it had earlier registered a different product. (See EPA's Cross-Mot. Exs. 3, 4.)[14] Plaintiffs offer no evidence to the contrary. Rather, plaintiffs argue the EPA has not shown it gave the public notice before it registered the earlier products and, consequently, has not shown the prior approvals are "precedential 'new uses.'" (See Pls.' Opp. at 34:1-16.)

As discussed above, the EPA is required to give public notice when an applicant seeking to register a pesticide product "proposes a new use" for the pesticide. See 40 C.F.R. § 152.102. Here, it is undisputed that the EPA, when it registered the products challenged by plaintiffs in the Third and Fourth Claims, approved uses for which it previously had given approval. Assuming, arguendo, the prior registrations approving new uses were issued without notice to the public, such registrations were subject to challenge at that time. See 7 U.S.C. § 136n. Nothing in FIFRA nor the implementing regulations, however, provides that a proposed use is "new" if the EPA previously approved the same use in a manner that violated FIFRA's notice provisions. Consequently, even assuming the prior approvals on which the EPA relies were issued in

_____

[14]The cited exhibits identify the portions of the administrative record in which the prior approvals are located.

violation of FIFRA's notice provisions, plaintiffs have failed to show the EPA violated FIFRA's notice provisions when it registered the products challenged in the Third and Fourth Claims.

Accordingly, defendants are entitled to summary judgment as to the Third and Fourth Claims.

## C. Fifth and Sixth Claims

In the Fifth Claim, titled "EPA's Actions in Approving Clothianidin Products and Labels Violated the ESA," plaintiffs allege the EPA violated the ESA by "approving registrations or use approvals" of twenty-four "clothianidin product registrations" without first consulting with the FWS "regarding the potential adverse effects of clothianidin on threatened and endangered species and critical habitat." (See SAC ¶ 128.)[15] In the Sixth Claim, titled "EPA's Actions in Approving Thiamethoxam Products and Labels Violated the ESA," plaintiffs allege the EPA "took agency action" forty-nine times with respect to forty-three "thiamethoxam product registrations." (See SAC ¶ 132.) In sum, plaintiffs challenge seventy-three actions by said two Claims.

### 1. Applicable Statutory Framework

Under the ESA, the FWS and the National Marine Fisheries Service ("NMFS") are required to determine which species are "endangered" or "threatened," see 16 U.S.C. § 1533(a),[16] and all other federal agencies "shall, in consultation with and with the assistance of [the FWS and the NMFS], insure that any . . . agency action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species," see 16 U.S.C. § 1536(a)(2). In particular, "[e]ach federal agency" is required to "review

---

[15]Although the Fifth Claim challenges twenty-eight registrations (see id.), the Court, on June 8, 2016, approved the parties' stipulation to dismiss the Fifth Claim to the extent it is based on the EPA's registration of Titan FL, Three-Way VAP, Proceed Plus, and AE 1283742.

[16]The FWS administers the ESA "with respect to terrestrial and freshwater species," while the NMFS administers the ESA "with respect to marine species." See National Wildlife Federation v. FEMA, 345 F. Supp. 2d 1151, 1167 (W.D. Wash. 2004).

1  its actions at the earliest possible time to determine whether any action may affect listed

2  species or critical habitat," and, if it makes such determination, "formal consultation [with

3  the FWS or NMFS] is required."  See 50 C.F.R. § 402.14(a).

4      **2.  Lack of Jurisdiction Under 7 U.S.C. § 136n(b)**

5      Relying on 7 U.S.C. § 136n(b), the Intervenors contend the Court lacks jurisdiction

6  to consider whether the EPA violated the ESA with respect to three of the actions

7  challenged in the Fifth Claim and two of the actions challenged in the Sixth Claim.

8  Specifically, the Intervenors argue, the Court lacks jurisdiction to consider, with respect to

9  the Fifth Claim, the registrations of Darlex Insecticide, Sepresto 75 WS and Prosper

10  Evergol, and, with respect to the Sixth Claim, the registrations of Agita 1GB Fly Bait and

11  Agita 10 WG.

12      Plaintiffs argue that the Court has jurisdiction to consider the entirety of the Fifth

13  and Sixth Claims pursuant to the jurisdictional provisions of the ESA, which allow a

14  plaintiff to file in district court a claim "to enjoin any person, including the United States

15  . . . who is alleged to be in violation of any provision of [the ESA]," see 16 U.S.C.

16  § 1540(g)(1), whereas the Intervenors argue that, with respect to the five actions

17  identified above, the jurisdictional provisions of FIFRA, not the ESA, apply.

18      Under FIFRA, in particular, 7 U.S.C. § 136n, if a plaintiff challenges "the validity of

19  any order issued by the [EPA] following a public hearing," the claim must be filed in "the

20  United States court of appeals for the circuit wherein [the plaintiff] resides or has a place

21  of business," see 7 U.S.C. § 136n(b); a plaintiff challenging "other final actions of the

22  [EPA]" must file the claim in a district court, see 7 U.S.C. § 136n(a).  The Intervenors

23  argue that the EPA, prior to registering Darlex Insecticide, Sepresto 75 WS, Prosper

24  Evergol, Agita 1GB Fly Bait and Agita 10 WG, conducted a "public hearing" within the

25  meaning of § 136n(b).  In support thereof, the Intervenors offer evidence showing the

26  EPA published in the Federal Register notice of the applications for registration of those

27  five products and afforded the public an opportunity to submit comments, and that the

28  EPA's registration of the five products occurred after the expiration of the deadline to

18

submit comments.  (See Schulson Decl. Exs. 1-7.)

Where an agency issues a decision following its having published in the Federal Register a notice inviting public comment on the subject, the agency has conducted a "public hearing" for purposes of § 136n(b).  See Center for Biological Diversity v. U.S. EPA, 847 F.3d 1075, 1090 (9th Cir. 2017) (citing United Farm Workers of America, AFL-CIO v. EPA, 592 F.3d 1080, 1082-84 (9th Cir. 2010)); see also United Farm Workers, 592 F.3d at 1082 (noting "'hearing' includes proceedings in which there is no presentation of public argument").  Consequently, where, as here, a plaintiff challenges the EPA's failure to consult with the FWS prior to registering a pesticide product, a conflict exists between the ESA and FIFRA when that registration is "preceded by a public comment and notice period published in the Federal Register."  See Center for Biological Diversity, 847 F.3d at 1090.  In such situations, the jurisdictional limitations of FIFRA apply, as § 136n(b) is the "more specific legislation."  See id. at 1089-90.  Thus, only a court of appeals has jurisdiction to hear a claim brought under the ESA for failure to consult, where the challenged action was taken following "a public comment and notice period."  See id. at 1090.

Here, as the EPA's decisions to register the above-referenced five products occurred after a "public hearing" within the meaning of § 136n(b), the Court lacks jurisdiction to review the propriety of those five registrations.  See id.

Accordingly, defendants are entitled to judgment on the Fifth Claim, to the extent it is based on the EPA's registrations of Darlex Insecticide, Sepresto 75 WS and Prosper Evergol, and are entitled to judgment on the Sixth Claim, to the extent is based on the EPA's registrations of Agita 1GB Fly Bait and Agita 10 WG.

### 3.  Standing

As to the remaining sixty-eight actions challenged in the Fifth and Sixth Claims, the Court next considers defendants' argument that plaintiffs lack standing to challenge the EPA's alleged failure to consult with the FWS before approving the subject

//

applications.[17]

"[A]lleged violations of [the ESA's] consultation requirement constitute a procedural injury for standing purposes." Natural Resources Defense Council v. Jewell, 749 F.3d 776, 783 (9th Cir.), cert. denied, 135 S. Ct. 676 (2014). Consequently, as set forth above, to establish standing, a plaintiff must show the ESA consultation procedures "are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing," see Cantrell, 241 F.3d at 679 (internal quotation and citation omitted), and that compliance with those procedures "could protect [his] concrete interests," see Natural Resources Defense Council, 749 F.3d at 783 (emphasis in original).

The "desire to use or observe an animal species" is "undeniably a cognizable interest for purposes of standing." See Lujan, 504 U.S. at 562-63. Here, plaintiffs argue the "ultimate basis" of their standing, see Cantrell, 241 F.3d at 679, is their interest in viewing certain threatened or endangered species.

Specifically, plaintiffs offer declarations from members of plaintiff Sierra Club and plaintiff Center for Food Safety, in which the declarants identify particular threatened or endangered species they have viewed or have attempted to view at specific locales, which locales they intend to visit in the future at specified times to view the species. (See Sekura Decl. ¶ 16 (averring she visits Conneaut Sandspit in Northeastern Ohio "several times a year," and will visit "for the coming fall migration," to observe "piping plover" and "red knots"); id. ¶¶ 17-18, 20 (averring she regularly visits Magee Marsh in western Ohio to view "Kirtland's warbler," Sheldon Marsh in Huron, Ohio to view "piping plovers," and Cuyahoga Valley National Park, as well as Cleveland Metro-parks, to view "Indiana bat habitat")); Hinerfeld Decl. ¶¶ 22-23 (averring he regularly visits Tryon Creek State Park

---

[17]To the extent the EPA asserts it is entitled to judgment for the reason that plaintiffs first address the issue of standing in their opposition to defendants' cross-motions rather than in plaintiffs' motion, the Court, for the reasons stated above with respect to the Third and Fourth Claims, disagrees.

and Springwater Trail in Oregon, where he looks for "northern spotted owl," and regularly visits Willamette Valley in Oregon, where he looks for "Fender's blue butterfly"); Ferrato Decl. ¶¶ 14, 16-17 (averring she "frequently and routinely" visits Cleveland Lakefront Nature Preserve to view "piping plover," and "frequently visits" Cuyahoga Valley National Park, as well as Cleveland Metro-parks, to view "habitat for piping plover" and "Indiana bat"); Hess Decl. ¶¶ 11, 13-19 (averring he regularly visits and will continue to visit Central Texas, Ding Darling National Wildlife Refuge in Florida, the Ochlocknee River in Florida, and Sarasota, Florida, to look for, view and photograph "black-capped vireo," "golden-cheeked warbler," "Audubon's crested caracara," "piping plover," "red-cockaded woodpecker," "wood stork," and "Florida scrub jay"); Zaber Decl. ¶¶ 10-12, 14 (averring he regularly visits and will continue to visit specified sites in Wisconsin, Michigan and Illinois to view habitat of "Karner blue butterfly," "Hine's emerald dragonfly" and "northern long-eared bat"); Goller Decl. ¶¶ 2, 8 (averring she visits "two times each week" Cuyahoga Valley National Park and Cleveland Metro-parks to "look[ ] for the piping plover" and will continue to do so); Owens Decl. ¶¶ 12-13 (averring she regularly visits specified rivers, parks, forests, lakes, estuaries, and preserves in San Diego and Imperial Counties in California, to look for "Coastal California gnatcatcher," "California least tern," "western snowy plover," "light-footed clapper rail," "Least Bell's vireo," "Quino checkerspot butterfly," "southwestern willow flycatcher," "arroyo toad," "San Diego fairy shrimp," "desert kit fox," "peninsular bighorn sheep" and "Yuma clapper rail"); Markham Decl. ¶¶ 7-8 (averring she has planted lupine in her garden in Stevens Point, Wisconsin, to attract "Karner blue butterfly," which species she desires to view); Crouch Decl. ¶ 14 (averring she regularly hikes and plans to continue hiking in Monroe County, Indiana, where she looks for "American burying beetle"); see also id. ¶ 20 (averring she intends in "summer of 2017" to visit Sarett Nature Center in Indiana to view "Mitchells' satyr butterfly").)

The Court finds, and defendants have not disputed, the above-identified declarations suffice to identity the "ultimate basis" of plaintiffs' standing, see Cantrell, 241

21

F.3d at 679, as they establish the declarants' interests in viewing specific endangered or threatened species at particular locales in the United States. Consequently, to establish the EPA's alleged lack of compliance with the ESA's consultation requirements caused the declarants to incur an injury in fact, plaintiffs must show such consultation requirements protect the declarants' interests in the threatened and endangered species they have identified. See Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1229 (9th Cir. 2008).

The next question is whether plaintiffs have sufficiently shown they have a "threatened concrete interest," see Cantrell, 241 F.3d at 679, i.e., an "injury in fact," see id. In that regard, the Court first notes, the purpose of the ESA's consultation requirement is "avoidance of harm to listed species." See Salmon Spawning & Recovery Alliance, 545 F.3d at 1229. Here, plaintiffs offer evidence that the types of crops and plants for which clothianidin and thiamethoxam have been approved for use, e.g., corn and lawns, are located in or in the near vicinity of the locales in which the declarants view or seek to view endangered and threatened species (see Wu Decl. ¶¶ 3-4, Exs. A, B; Sekura Decl. ¶¶ 16-18; Hess Decl. ¶¶ 22, 24; Ferrato Decl. ¶ 18; Hess ¶¶ 13-16; Zaber Decl. ¶¶ 13-16: Owens Decl. ¶¶ 12-13; Markham Decl. ¶¶ 3, 8; Crouch Decl. ¶¶ 12, 14), and that the use of clothianidin and thiamethoxam may increase the risk of harm to those species (see, e.g., Wu Decl. Ex. L at 2 (AR 75065) (statement by EPA in "Pesticide Fact Sheet" that, with respect to clothianidin, "exposure to treated seeds through ingestion may result in chronic toxic risk to . . . endangered small birds (e.g., songbirds) and acute/chronic toxicity risk to . . . endangered mammals"); id. Ex. L at 16 (statement by EPA that "[c]lothianidin is expected to present acute and/or chronic toxic risk to endangered/threatened birds and mammals via possible ingestion of treated corn and canola seeds" and "[e]ndangered/threatened non-target insects may be impacted via residue laden pollen and nectar"); AR 43539-40 (assessment by EPA that "only a few seeds" of corn or canola treated with clothianidin "may be necessary to cause reproductive and/or development effects" on endangered "small birds" and "mammals");

22

AR 42673, 42787-830 (EPA document identifying over eight hundred "federally listed and endangered species that will potentially be affected from thiamethoxam usage" on blackberries, broccoli, collards, grapes, lettuce, and other specified crops, as well as on turf grass); AR 43280 (assessment by EPA that, when thiamethoxam is used on "dry bulb onions and peanuts as a seed treatment" and on "corn, carrots, leafy vegetables, and brassica (cole) leafy vegetables," it has "potential direct effects" and/or "indirect effects" on "federally listed taxa," such as "birds," "terrestrial-phase amphibians" and "mammals"); see also AR 42404, 43005-12, 43025, 43059-61, 43086-88, 43432-33, 43634, 43675-80; 43748, 43789-93.)

The EPA argues plaintiffs' showing is insufficient to establish an injury in fact, as the evidence cited by plaintiffs does not, according to the EPA, "prove that some concrete injury will imminently result from the specific EPA decisions at issue." (See EPA's Reply at 3:13-14.) Plaintiffs, however, "need not assert any specific injury will occur," but only that "environmental consequences might be overlooked as a result of deficiencies in the government's analysis under [the ESA]." See Citizens for Better Forestry, 341 F.3d at 971-72 & n.6 (internal quotation and citation omitted); Cantrell, 241 F.3d at 679 (holding plaintiff alleging procedural injury "need not show the substantive environmental harm is imminent"); see also Summers, 555 U.S. at 497 (observing party alleging procedural injury caused by agency's failure to provide public notice of proposed action would have standing "despite the possibility" such agency, if it afforded plaintiff right to comment, might not be "persuad[ed]" thereby).[18] Put another way, a plaintiff, for purposes of standing, need only show the EPA's decision to register a challenged product "arguably may affect" endangered or threatened species. See Defenders of Wildlife v. Flowers, 414 F.3d 1066, 1069 (9th Cir. 2005) (holding, where plaintiffs challenged agency's failure to consult, plaintiffs established standing by showing

---

[18]Indeed, to accept the EPA's argument would, in essence, require plaintiffs to "conduct the same environmental investigation [they] seek[ ] . . . to compel the agency to undertake." See Citizens for Better Forestry, 341 F.3d at 971 n.6, 972.

"agency's decisions arguably may affect" specific endangered species in which plaintiffs had cognizable interest); see also Natural Resource Defense Council, 749 F.3d at 776, 780, 783-84 (holding, where plaintiffs alleged EPA failed to comply with ESA prior to approving water supply contracts, plaintiffs established standing by showing that "if the [agency] engage[d] in adequate consultation, the [contracts] could better protect [p]laintiffs' concrete interest in [endangered species] than the contracts [did] currently").

The Intervenors argue plaintiffs have not, however, shown a "causal link between any product approved by the EPA in any of the challenged agency actions . . . and [the declarants'] interest in a listed species" (see Intervenors' Reply at 4:13-17), as, according to the Intervenors, plaintiffs have not shown the particular geographic locales identified by the declarants could be affected by the registered clothianidin and thiamethoxam products challenged in the Fifth and Sixth Claims. As set forth below, the Court disagrees.

None of the challenged registrations issued by the EPA limit the use of the products to any geographic locale, and the administrative record includes numerous statements by the EPA confirming the pesticides at issue are used throughout the United States. (See AR 43633 (statement by EPA that "there are no apparent geographic limitations for the use of [clothianidin] within the United States"); Wu Decl., filed April 14, 2016, Ex. L at 16 (AR 75066) (statement by EPA that "potential use sites" for clothianidin "cover the entire U.S."); AR 43252, 43280, 43312-410 (assessment by EPA "identif[ying] potential direct effects" and "indirect effects" on listed species in all 50 states as result of use of thiamethoxam on dry bulb onions, peanut seeds, carrots, brassica (cole) leafy vegetables, corn, and leafy vegetable seeds); AR 43061 (table by EPA identifying 41 states with listed species "directly/indirectly affected" by use of thiamethoxam on citrus fruits and tree nuts).)

Under such circumstances, the Court finds the declarants' interests in viewing listed species at the particular parks, rivers, marshes and other geographic locations identified in their respective declarations suffice to establish the requisite causal link. See

24

United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 686-88 (1973) (holding plaintiffs, who alleged their recreational interests in "forests, streams, mountains and other resources in the Washington metropolitan area" were adversely affected by agency action, sufficiently established injury in fact, where challenged action "allegedly ha[d] an adverse environmental impact on all the natural resources of the country").

Accordingly, the Court finds plaintiffs have adequately demonstrated an injury in fact.

The remaining issue as to standing is whether, if the EPA were to comply with the ESA, such action "could protect [plaintiffs'] concrete interests." See Natural Defenders Defense Council, 749 F.3d at 783 (emphasis in original).  In that regard, the EPA argues, were the Court to direct the EPA to comply with the ESA's consultation requirements, no action thereafter taken by the EPA could protect plaintiffs' interests in any listed species, because, according to the EPA, not all products containing clothianidin and thiamethoxam are challenged by the Fifth and Sixth Claims, and, consequently, "growers and other pesticide users . . . could simply substitute other existing clothianidin and thiamethoxam products" if the EPA did not allow the products challenged by plaintiffs to continue to be sold.  (See EPA's Reply at 6:12-15.)

Plaintiffs, however, are required to show only that "the relief requested -- that the agency follow the correct procedure -- may influence the agency's ultimate decision of whether to take or refrain from taking a certain action."  See Salmon Spawning & Recovery Alliance, 545 F.3d at 1226-27.  As discussed above in connection with the First and Second Claims, the EPA has the power to give notice of its intention to cancel a registered pesticide when it appears the pesticide "generally causes unreasonable adverse effects on the environment," see 7 U.S.C. § 136d(b), and to suspend use of the pesticide during cancellation proceedings, see 7 U.S.C. § 136d(c)(1).  Consequently, were plaintiffs to prevail on the remaining portions of the Fifth and Sixth Claims and if the EPA, after consultation with the NWS, were to find use of the challenged clothianidin and

thiamethoxam products may adversely affect listed species, the EPA could find the non-challenged clothianidin and thiamethoxam products likewise pose a sufficient threat to listed species to warrant its taking action as to those products as well, particularly given that the uses for many of the challenged products, as discussed above, had been approved previously for unchallenged products.

Accordingly, the Court finds plaintiffs have standing to assert the remaining portions of the Fifth and Sixth Claims.

### 4. Merits

As set forth above, the ESA requires federal agencies to consult with the FWS or the NMFS to insure "agency action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." See 16 U.S.C. § 1536(a)(2). "An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat." Karuk Tribe v. United States Forestry Service, 681 F.3d 1006, 1027 (9th Cir. 2012), cert. denied, 133 S. Ct. 1579 (2013).

Here, the EPA concedes it has not consulted either said agency nor made a "no effect" determination with respect to the actions challenged in the Fifth and Sixth Claims. (See EPA's Cross-Mot. at 21:5-7.) Accordingly, in the absence of a showing that the ESA's consultation requirements do not apply to the remaining sixty-eight alleged agency actions identified in the Fifth and Sixth Claims, plaintiffs, with respect to those agency actions, are entitled to a finding in their favor on the issue of liability.[19]

The Court next considers the Intervenors' argument that the ESA's consultation requirements apply to none of the remaining agency actions, as well as the EPA's

_____

[19]In their respective briefs, the parties disagree as to directions the Court should give the EPA in an order of remand. In particular, the parties disagree as to whether, in the event judgment is entered in favor of plaintiffs, the Court should direct the EPA to engage in consultation or only direct the EPA to determine whether it should engage in consultation. As the sole issue before the Court at the present time is the issue of liability, the Court does not address herein what directions should be included in any order of remand.

United States District Court
Northern District of California

argument that the ESA's consultation requirements do not apply to the majority of those actions.

### a. Lack of Agency Action

The EPA argues that eleven of the remaining sixty-eight challenged actions are not "agency actions" within the meaning of the ESA, and, consequently, that plaintiffs cannot show the EPA had a duty to consult prior to taking those eleven actions.

The duty to consult is "trigger[ed]" only if the agency engages in "agency action." See Karuk Tribe, 681 F.3d at 1021 (internal quotation and citation omitted).  To determine whether an agency, for purposes of the ESA, has engaged in an "agency action," courts apply a "two-fold" test.  See id.  The court first determines "whether [the] agency affirmatively authorized, funded, or carried out the underlying activity," and, second, "whether the agency had some discretion to influence or change the activity for the benefit of a protected species."  See id.

### (1) Converting Registrations from Conditional to Unconditional

Two of the above-referenced eleven actions concern conversions from conditional to unconditional registrations.

In May 2003, the EPA issued notices "conditionally" registering Poncho 600 and Clothianidin Technical Insecticide for a period of three years.  (See AR 67402-03, 67632-34.)  At that time, the EPA imposed certain conditions on the registrants, including requiring them to submit seven studies "to satisfy the data gaps in the data base for clothianidin."  (See AR 67402-03, 67632-34.)  Thereafter, in May 2008, the EPA issued notices conditionally registering the two products for an additional year,[20] and requiring the registrants to submit, within the one-year period, one of the seven studies identified in

//

//

---

[20]No party has cited a document in the administrative record indicating whether Poncho 600 and Clothianidin Technical were conditionally registered between May 2006 and May 2008, and, if so, what conditions were imposed on any such registration.

27

the 2003 notices.  (See AR 75102-03, 75121-22.)[21]  In April 2009, the EPA issued notices

conditionally registering the two products for another one-year period, in which notices

the EPA stated it had received and was reviewing all the studies.  (See AR 75119-20;

see also AR 75109.)  Lastly, in April 2010, the EPA issued an "unconditional" registration

for each of the two products.  (See AR 67408, 67649.)

Plaintiffs, as part of the Fifth Claim, allege the two unconditional registrations

issued in 2010 were "agency actions triggering [a] duty to consult."  (See SAC ¶ 128.)

The EPA argues plaintiffs cannot establish a duty to consult existed because, the EPA

asserts, its "decisions to convert these registrations from conditional to unconditional

[were] non-discretionary."  (See EPA's Cross-Mot. at 15:23-28.)

A registration under FIFRA may be "unconditional," see 7 U.S.C. § 136a(c)(5), 40

C.F.R. § 152.115(a), or "conditional," see 7 U.S.C. § 136a(c)(7).  Here, in 2003, the EPA

issued conditional registrations for Poncho 600 and Clothianidin Technical Insecticide

under § 136(c)(7)(C), which provides as follows:

> The [EPA] may conditionally register a pesticide containing an active
> ingredient not contained in any currently registered pesticide for a period
> reasonably sufficient for the generation and submission of required data
> (which are lacking because a period reasonably sufficient for generation of
> the data has not elapsed since the [EPA] first imposed the data
> requirement) on the condition that by the end of such period the [EPA]
> receives such data and the data do not meet or exceed risk criteria
> enumerated in regulations issued under [FIFRA], and on such other
> conditions as the [EPA] may prescribe.  A conditional registration under this
> subparagraph shall be granted only if the [EPA] determines that use of the
> pesticide during such period will not cause any unreasonable adverse effect
> on the environment, and that use of the pesticide is in the public interest.

See 7 U.S.C. § 136a(c)(7)(C).  The 2008 and 2009 conditional registrations were issued

under § 136a(c)(7)(A), which provides as follows:

> The [EPA] may conditionally register . . . a pesticide if the [EPA] determines
> that (i) the pesticide and proposed use are identical or substantially similar
> to any currently registered pesticide and use thereof, or differ only in ways
> that would not significantly increase the risk of unreasonable adverse

---

[21]In the May 2008 notices, the EPA acknowledged the registrants' submission of other studies identified in the 2003 notices and stated the submitted studies were "under review."  (See id.)

effects on the environment, and (ii) approving the registration . . . in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment. An applicant seeking conditional registration . . . under [§ (c)(7)(A)] shall submit such data as would be required to obtain [unconditional] registration of a similar pesticide under [§ 136a(c)(5)]. If the applicant is unable to submit an item of data because it has not yet been generated, the Administrator may register . . . the pesticide under such conditions as will require the submission of such data not later than the time such data are required to be submitted with respect to similar pesticides already registered under [FIFRA].

See 7 U.S.C. § 136a(c)(7)(A). Thereafter, as noted, the EPA, in 2010, unconditionally registered Poncho 600 and Clothianidin Technical under § 136a(c)(5), which, in relevant part, provides as follows:

The [EPA] shall register a pesticide if the [EPA] determines that . . . (A) its composition is such as to warrant the proposed claims for it; (B) its labeling and other material required to be submitted comply with the requirements of [FIFRA]; (C) it will perform its intended function without unreasonable adverse effects on the environment; and (D) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment.

See 7 U.S.C. § 136a(c)(5).

The EPA argues that its decisions to convert the two registrations from conditional to unconditional were "non-discretionary" because its decisions in 2010 were "based solely on the registrants' submission of specific studies the EPA had required in 2003." (See EPA's Cross-Mot. at 15:26 - 16:1.) By way of further explanation, the EPA states "[t]he only thing the [EPA] may consider is determining whether the registrant met the dat[a] submission deadline and that its submission is acceptable under the applicable data sufficiency criteria or 'such other conditions as the [EPA] may prescribe.'" (See id. at 16:14-16 (quoting 7 U.S.C. § 136a(c)(7)(C).) The Court is not persuaded.

At the outset, the Court notes that the authority the EPA cites for the above proposition is § 136a(c)(7)(C), a statute governing conditional registrations. Before the EPA may register a pesticide product on an unconditional basis, however, it must, as set forth above, determine the product "will perform its intended function without unreasonable adverse effects on the environment" and that "when used in accordance with widespread and commonly recognized practice it will not generally cause

29

1  unreasonable adverse effects on the environment."  See 7 U.S.C. § 136a(c)(5).  An

2  unconditional registration, unlike a conditional registration, has no temporal limitation, and

3  nothing in § 136a(c)(5) suggests that any of its requirements are inapplicable to products

4  that previously have been registered on a conditional basis.

5  Moreover, the regulations governing FIFRA registrations point up the differing

6  decisions the EPA must make when it registers a pesticide on an unconditional as

7  opposed to a conditional basis.  The regulation pertaining to unconditional registrations,

8  specifically, 40 C.F.R. § 152.112, provides, in keeping with the above-referenced statute,

9  that before the EPA may issue an unconditional registration, it must make a number of

10  findings, including, as set forth in § 152.112(e), that "the product will perform its intended

11  function without unreasonable adverse effects on the environment, and that, when used

12  in accordance with widespread and commonly recognized practice, the product will not

13  generally cause unreasonable adverse effects on the environment."  See 40 C.F.R.

14  § 152.112(e).

15  By contrast, the regulations pertaining to the issuance of conditional registrations,

16  specifically, 40 C.F.R. §§ 152.113 and 152.114, while requiring the EPA to determine

17  certain of the "criteria in § 152.112 . . . have been satisfied," do not require at that time a

18  determination as to the criteria set forth in § 152.112(e), i.e., a determination that use of

19  the product for an unlimited period of time will not adversely affect the environment.  See

20  40 C.F.R. §§ 152.113(a)(3), 152.114(c) (listing by subsection all criteria that "must have

21  been satisfied"; omitting subsection (e)).  Rather, as the Ninth Circuit has observed, "[t]he

22  EPA conditionally registers a pesticide when there is insufficient data to evaluate the

23  environmental effects of a new pesticide."  See Pollinator Stewardship Council v. EPA,

24  806 F.3d 520, 523 (9th Cir. 2015).  A conditional registration thus provides for what is, in

25  effect, a trial period during which the product can be used while the registrant obtains

26  additional data required by the EPA, which the EPA then reviews to determine whether

27  issuance of an unconditional registration is appropriate.

28  //

United States District Court
Northern District of California

30

1    Here, consistent with the above-described procedure, the EPA initially registered

2    Poncho 600 and Clothianidin Technical on a conditional basis in light of its finding that it

3    lacked sufficient data to determine whether issuance of unconditional registrations was

4    proper, see Pollinator Stewardship Council, 806 F.3d at 523 (holding "[u]conditional

5    registration necessarily requires sufficient data to evaluate the environmental risks"), and,

6    as discussed above, required the registrants to provide seven specified studies to assist

7    the EPA in making such a determination, including "an acceptable Seed Leaching study,"

8    as well as "additional analysis of . . . the materials used in the previously submitted

9    mutagenicity studies," and "an acceptable Aerobic Aquatic Metabolism study" (see AR

10   67402-03, 67632-34). "[S]tudies . . . pertain[ing] to leaching" are used by the EPA to

11   assess, inter alia, "potential environmental hazards related to . . . habitat loss of wildlife

12   resulting from pesticide residue movement or transport in the environment," see 40

13   C.F.R. § 161.202(d)(4) (2010), "mutagenicity studies" are used by the EPA to assess,

14   inter alia, "hazards to . . . domestic animals," see 40 C.F.R. § 161.202(e)(5) (2010), and

15   "aerobic . . . metabolism studies" are used by the EPA to assess, inter alia, "the

16   persistence of [the] pesticide" in the environment, see 40 C.F.R. § 161.202(d)(3) (2010).

17        As set forth above, the test applicable to the "agency action inquiry," see Karuk

18   Tribe, 681 F.3d at 1021, is "whether the agency had some discretion to influence or

19   change the activity for the benefit of a protected species," id. Here, when the EPA

20   ordered studies to be submitted by the registrants, it did so for the purpose of determining

21   whether the conditional registrations should be converted to unconditional registrations

22   under § 136a(c)(5), which determination, as set forth above, required the EPA to review

23   and assess the results of those studies, in order to determine whether Poncho 600 and

24   Clothianidin would "perform [their] intended function without unreasonable adverse

25   effects on the environment" and would "not generally cause unreasonable adverse

26   effects on the environment."  See 7 U.S.C. § 136a(c)(5).  Conducting such an

27   assessment and making such a determination cannot be equated with the wholly non-

28   discretionary task of stamping the materials "Received."

Accordingly, the Court finds the 2010 decisions to convert the conditional registrations of Poncho 600 and Clothianidin Technical Insecticide to unconditional registrations constituted "agency action" for purposes of the ESA.

**(2) Notice of Applications for New Uses**

Nine of the above-referenced eleven actions concern what plaintiffs allege are approvals and defendants contend are notices.

In the remaining portion of the Sixth Claim, plaintiffs allege the EPA engaged in forty-seven "agency actions," which actions include, according to plaintiffs, the EPA's having issued "new use approvals" for the following products on the following dates: (1) Cruise 70 WS Insecticide on October 26, 2009; (2) Thiamethoxam Technical on March 19, 2010; (3) Thiamethoxam Technical on May 5, 2010; (4) Thiamethoxam Technical on July 6, 2011; (5) Cruiser Insecticide on March 19, 2010; (6) Cruiser Insecticide on May 5, 2010; (7) Cruiser Insecticide on July 6, 2011; (8) Optigard ZT Insecticide on August 18, 2010; and (9) Optigard Flex Liquid on August 18, 2010. (See SAC ¶ 132.) The EPA argues that, as to these nine alleged "agency actions," the EPA did not "affirmatively authorize[ ], fund[ ], or carr[y] out" any activity, see Karuk Tribe, 681 F.3d at 1021, but, rather, gave the public notice of its receipt of an application to register products and invited the public to comment thereon.

In support thereof, the EPA relies on the Federal Register, which indicates that, on each of the nine dates identified above, the EPA gave notice to the public of a pending application for approval of a new use for a product containing thiamethoxam. See 74 Fed. Reg. at 54999 (giving notice, on October 29, 2009, of application to register new use for Cruiser 70 WS Insecticide); 75 Fed. Reg. at 13282 (giving notice, on March 19, 2010, of application to register new use for both Thiamethoxam Technical and Cruiser Insecticide); 75 Fed Reg. at 24696 (giving notice, on May 5, 2010, of application to register new use for both Thiamethoxam Technical and Cruiser Insecticide); 75 Fed. Reg. at 51045 (giving notice, on August 18, 2010, of applications to register new use for Optigard ZT Insecticide and for Optigard Flex Liquid); 75 Fed. Reg. at 39396 (giving

1    notice, on July 6, 2011, of application to register new use for both Thiamethoxam

2    Technical and Cruiser Insecticide).

3        Plaintiffs, although appearing to "concede" in their opposition that the nine subject

4    actions were not approvals of applications to register pesticide products (see Pls.' Opp. at

5    10:24-26), offer no explanation as to how the act of giving the public notice of a pending

6    application constitutes "agency action" within the meaning of the ESA, nor is any such

7    explanation otherwise apparent.  Rather, the Court agrees with the EPA that giving notice

8    is not "agency action," as the EPA did not, by providing such notice, take any "affirmative

9    action" or provide any "federal authorization" with respect to any application.  See Karuk

10   Tribe, 681 F.3d at 1021 (internal quotation and citation omitted).

11       Accordingly, defendants are entitled to judgment on the Sixth Claim to the extent it

12   is based on the nine alleged "new use approvals."

13           **b.  Collateral Attack Doctrine**

14       The Intervenors argue that all remaining agency actions challenged in the Fifth

15   and Sixth Claims are barred by the collateral attack doctrine, and the EPA argues that all

16   but two of the remaining agency actions are so barred.[22]

17       "The collateral attack doctrine prevents litigants from relitigating the merits of

18   previous administrative proceedings or evading established administrative procedures by

19   raising a claim that is inescapably intertwined with a review of the procedures and merits

20   surrounding an underlying agency order."  Center for Biological Diversity, 847 F.3d at

21   1092 (internal quotation, alterations and citation omitted).  "At its core, the doctrine

22   prohibits a plaintiff from using a later order that implements a prior agency action as a

23   vehicle to undo the underlying action or order."  Id.

24       All of the remaining agency actions are conditional or unconditional registrations of

25   specific products containing either clothianidin or thiamethoxam, which pesticides appear

26

27   _____
         [22]The EPA does not contend its conditional registrations of Poncho Beta and
28   Cruise PD Insecticide are barred by the collateral attack doctrine.

                                          33

in products previously registered in, respectively, 2003 and 2000. (See Schulman Decl. Exs. 21, 24; Intervenors' Req. for Judicial Notice Exs. 1-2.) The Intervenors argue plaintiffs' challenges to the current registrations are, in effect, challenges to the earlier registrations and, as such, are barred by the collateral attack doctrine. The EPA takes a similar but slightly narrower position, in confining its argument to the challenges that concern current registrations for products that not only contain clothianidin or thiamethoxam, but are identical or substantially similar to earlier-registered products. (See EPA's Cross-Mot. Exs. 1, 2.) In response, plaintiffs argue that the EPA's duty to consult as to "every discretionary agency action," see National Wildlife Federation v. National Marine Fisheries Service, 524 F.3d 917, 929 (9th Cir. 2008), encompasses its determinations whether to register pesticide products containing a pesticide that has been approved for use in other products, even if the newer products are identical or substantially similar to products whose registrations are not challenged.

As the Ninth Circuit has explained, the collateral attack doctrine does not bar a claim that the EPA failed to consult when it registered a pesticide product, provided the EPA has not merely "rubber stamp[ed]" the application in light of an earlier decision not challenged by the plaintiff. See Center for Biological Diversity, 847 F.3d at 1093. Put another way, where the EPA, in deciding whether to approve a new application, does more than simply adopt its decision as to an earlier application, a plaintiff who challenges the new registration "does not seek to unravel a prior agency order." See id.

Here, there is no showing by defendants that the EPA, when it registered any product that is the subject of the remaining portions of the Fifth and Sixth Claims, did nothing other than adopt a prior decision. Nor does it appear such a showing could be made, as even where an applicant seeks to register a pesticide for uses that are "identical or substantially similar to any currently registered pesticide," the EPA nonetheless is required to make at that time a finding that "approving the registration . . . in the manner proposed by the applicant would not significantly increase the risk of any unreasonable adverse effect on the environment." See 7 U.S.C. § 136a(c)(7)(A).

1    Accordingly, the Court finds the collateral attack doctrine does not bar any of the

2    remaining portions of the Fifth and Sixth Claims.

3    **c.  Conclusion as to Fifth and Sixth Claims**

4    As to the Fifth Claim, defendants are entitled to summary judgment to the extent

5    the claim challenges the registration of the following three products:

6    (1) Darlex Insecticide on March 18, 2010;

7    (2) Sepresto 75 WS on April 28, 2010; and

8    (3) Prosper Evergol on May 11, 2012.

9    As to the Fifth Claim, plaintiffs are entitled to summary judgment on the issue of

10   liability to the extent the claim challenges the registration of the following twenty-one

11   products:

12   (1) Aloft GC SC Insecticide on October 18, 2007;

13   (2) Aloft LC SC Insecticide on October 18, 2007;

14   (3) Aloft GC G Insecticide on October 18, 2007;

15   (4) Aloft LC G Insecticide on October 18, 2007;

16   (5) V-10170 2.13SC Insecticide on January 4, 2008;

17   (6) Insecticide TD Concentrate on January 28, 2008;

18   (7) V-10170 5 FS Insecticide on February 28, 2008;

19   (8) Poncho Beta on March 7, 2008;

20   (9) V-10170 0.25G GL Insecticide on January 27, 2009;

21   (10) Flower, Rose, and Shrub Care III on July 30, 2009;

22   (11) Flower, Rose, and Shrub Care II on August 24, 2009;

23   (12) Insecticide TD Granule on December 28, 2009;

24   (13) Poncho/Votivo on March 16, 2010;

25   (14) Poncho 600 on April 22, 2010;

26   (15) Clothianidin Technical Insecticide on April 22, 2010;

27   (16) Poncho/GB 126 on April 29, 2011;

28   (17) Inovate Seed Protectant on June 21, 2011;

(18) NipsIt Suite Cereals of Seed Protectant on December 21, 2011;

(19) NipsIt Suite Canola Seed Protectant on January 6, 2012;

(20) Inovate Neutral Seed Protectant on January 25, 2012; and

(21) Ernesto Quantum on May 11, 2012.

As to the Sixth Claim, defendants are entitled to summary judgment to the extent the claim challenges the following eleven actions:

(1) registration of Agita 1GB Fly Bait on December 8, 2010;

(2) registration of Agita 10 WG on December 8, 2010;

(3) alleged new use approval of Cruise 70 WS Insecticide on October 26, 2009;

(4) alleged new use approval of Thiamethoxam Technical on March 19, 2010;

(5) alleged new use approval of Thiamethoxam Technical on May 5, 2010;

(6) alleged new use approval of Thiamethoxam Technical on July 6, 2011;

(7) alleged new use approval of Cruiser Insecticide on March 19, 2010;

(8) alleged new use approval of Cruiser Insecticide on May 5, 2010;

(9) alleged new use approval of Cruiser Insecticide on July 6, 2011;

(10) alleged new use approval of Optigard ZT Insecticide on August 18, 2010; and

(11) alleged new use approval of Optigard Flex Liquid on August 18, 2010.

As to the Sixth Claim, plaintiffs are entitled to summary judgment on the issue of liability to the extent the claim challenges the registration of the following thirty-eight products:

(1) Optigard Ant Gel Bait on April 4, 2007;

(2) Thiamethoxam Ant Killer Gel on April 4, 2007;

(3) Endigo ZC on August 21, 2007;

(4) THX/MXM/FDL CZ on September 20, 2007;

(5) Thiamethoxam Lawn & Landscape 0.33G on November 2, 2007;

(6) Thiamethoxam Lawn & Landscape 0.22G on November 2, 2007;

(7) Platinum 75 SG Insecticide on January 17, 2008;

(8) Optigard Flex Liquid on March 28, 2008;

(9) Thiamethoxam 0.02/Lambda-cyhalothrin on April 4, 2008;

(10) CruiserMaxx Cereals on April 16, 2008;

(11) Voliam Flexi Insecticide on August 25, 2008;

(12) Durivo on August 26, 2008;

(13) Avicta Duo on October 31, 2008;

(14) Cruiser 70 WS Insecticide on November 20, 2008;

(15) Thiamethoxam 0.40/Lambda-cyhalothrin 0.16 ME Concentrate
on May 12, 2009;

(16) Thiamethoxam 0.010/Lambda-cyhalothrin 0.004 ME RTU on May 12,
2009;

(17) Meridian 0.20G on June 22, 2009;

(18) Meridian 0.14G on July 1, 2009;

(19) Avicta Duo 250 on October 27, 2009;

(20) Agri-Flex Miticide/Insecticide on April 6, 2010;

(21) CruiserMaxx Vibrance Cereals on June 20, 2010;

(22) CruiserMaxx Rice on July 20, 2010;

(23) Optigard Liquid Ant Bait on August 2, 2010;

(24) Four-Way VAP on October 29, 2010;

(25) Avicta Complete Corn 500 on June 15, 2011;

(26) Cruiser PD Insecticide on August 5, 2011;

(27) Difenoconazole 0.170/Thiamethoxam 0.010/Lambda-cyhalothrin 0.004
ME RTU on August 5, 2011;

(28) Difenoconazole 0.66/Thiamethoxam 0.40/Lambda-cyhalothrin 0.16 ME
Concentrate on August 5, 2011;

(29) Avicta Complete Corn 250 on October 19, 2011;

(30) Caravan G on January 11, 2012;

(31) THX_MXM_FDL_TBZ FS on February 2, 2012;

(32) CruiserMaxx EZ on February 2, 2012;

(33) Derby on April 23, 2012;

(34) Tandem on April 23, 2012;

(35) CruiserMaxx Peanuts on April 30, 2012;

(36) Solvigo Miticide/Insecticide on June 21, 2012;

(37) Adage Delux on August 23, 2012; and

(38) Adage Premier on August 23, 2012.

## CONCLUSION

For the reasons stated above:

1. Plaintiffs' motion for summary judgment is hereby GRANTED in part and DENIED in part as follows:

a. As to the Fifth Claim, plaintiffs are entitled to summary judgment on the issue of liability to the extent such claim challenges the registrations of the twenty-one products identified above at page 35, line 9, through page 36, line 4.

b. As to the Sixth Claim, plaintiffs are entitled to summary judgment on the issue of liability to the extent such claim challenges the registrations of the thirty-eight products identified above at page 36, line 21, through page 38, line 9.

c. In all other respects, plaintiffs' motion is DENIED.

2. Defendants' motions for summary judgment are hereby GRANTED in part and DENIED in part, as follows:

a. As to the First, Second, Third and Fourth Claims, defendants are entitled to summary judgment.

b. As to the Fifth Claim, defendants are entitled to summary judgment to the extent the claim challenges the registrations of the three products identified above at page 35, lines 4 through 8.

c. As to the Sixth Claim, defendants are entitled to summary judgment to

the extent such claim challenges the eleven actions identified above at page 36, lines 5 through 20.

        d.  In all other respects, defendants' motions are DENIED.

3.  As to the Fifth and Sixth Claims, to the extent plaintiffs have established the EPA's liability, the parties are hereby DIRECTED to meet and confer, and to thereafter file, no later than May 26, 2017, a jointly proposed briefing schedule and hearing date, or, if the parties are unable to agree on a schedule, a joint filing in which they set forth their respective proposals.

4.  In light of the above rulings on the issue of liability, and the amount of time that has passed since the parties last participated in any form of court-sponsored ADR, the parties are hereby REFERRED back to Magistrate Judge Jacqueline Scott Corley and are hereby DIRECTED to contact her chambers forthwith to schedule a settlement conference, which, at the parties' election, may be conducted in advance of the above-referenced briefing.

**IT IS SO ORDERED.**

Dated:  May 8, 2017

                                     MAXINE M. CHESNEY
                                     United States District Judge