GEORGE A. KIMBRELL (*Pro Hac Vice*)
Center for Food Safety
917 SW Oak St. Suite 300
Portland, Oregon 97205
T: (971) 271-7372 / F: (971) 271-7374
Email: gkimbrell@centerforfoodsafety.org

PAIGE M. TOMASELLI (State Bar No. 237737)
SYLVIA SHIH-YAU WU (State Bar No. 273549)
PETER T. JENKINS (*Pro Hac Vice*)
Center for Food Safety
303 Sacramento Street, 2nd Floor
San Francisco, CA 94111
T: (415) 826-2770 / F: (415) 826-0507
Emails: ptomaselli@centerforfoodsafety.org
        swu@centerforfoodsafety.org
        pjenkins@centerforfoodsafety.org

*Counsel for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| STEVE ELLIS, *et al.*, | ) Case No. 3:13-cv-01266-MMC |
| | ) |
| *Plaintiffs*, | ) **PLAINTIFFS' OPENING REMEDY** |
| | ) **BRIEF** |
| v. | ) |
| | ) Date: February 23, 2018 |
| JACK HOUSENGER, *et al.*, | ) Time: 9:00 a.m. |
| | ) Location: Courtroom 7, 19th Floor |
| *Defendants*, | ) Hon. Maxine M. Chesney |
| | ) |
| and | ) |
| | ) |
| BAYER CROPSCIENCE, LP, *et al.*, | ) |
| | ) |
| *Defendant-Intervenors*. | ) |
| | ) |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ................................................................................................................ 1

I.     THE COURT SHOULD ISSUE DECLARATORY RELIEF
THAT THE "MAY AFFECT" THRESHOLD IS MET FOR THE
PESTICIDES. ...................................................................................................... 1

     A.    The "May Affect" Threshold Requiring Consultation Is
Met Here. ................................................................................................ 2

     B.    The Court Should Hold the "May Affect" Threshold Met
and Need Not Give EPA Further Time to Delay or Avoid
Consultation. .......................................................................................... 9

     C.    Failure to Order Consultation Would Leave Protected
Species At Further Risk. ...................................................................... 10

II.    THE COURT SHOULD VACATE THE PESTICIDE
REGISTRATIONS. ........................................................................................... 13

     A.    Vacatur is the Presumptive Remedy and Defendants Have
the Burden to Show Why the Unlawful Agency Actions
Should Not Be Vacated. ....................................................................... 14

     B.    Failure to Follow the ESA Consultation Process Is a Very
Serious Violation of Law. ..................................................................... 16

     C.    Consequences of Vacatur Do Not Outweigh Risks to
Endangered Species From EPA's Repeated and Long-
Standing Violations of The ESA............................................................ 18

III.   ALTERNATIVELY THE COURT SHOULD REQUIRE EPA
ACT BY DEADLINES AND RETAIN JURISDICTION TO
OVERSEE COMPLIANCE................................................................................. 24

CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

**Federal Cases** Page(s)

*AFL–CIO v. Chao,*
  496 F. Supp. 2d 76 (D.D.C. 2007) ...................................................................17

*Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ........................................................................15

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987) .........................................................................................25

*Arizona Elec. Power Coop. v. United States,*
  816 F.2d 1366 (9th Cir.1987) ..........................................................................24

*Cabinet Mountains Wilderness v. Peterson,*
  685 F.2d 678 (D.C. Cir. 1982) ........................................................................14

*Cal. Communities Against Toxics v. U.S. Envt'l Prot. Agency,*
  688 F.3d 989 (9th Cir. 2012) .....................................................................15, 19

*Center for Biological Diversity v. Brennan,*
  571 F. Supp. 2d. 1105 (N.D. Cal. 2007) .........................................................24

*Center for Biological Diversity v. EPA,*
  861 F.3d 174 (D.C. Cir. 2017) ........................................................................23

*Church of Scientology of California v. U.S.,*
  506 U.S. 9 (1992) .............................................................................................22

*City of Tacoma v. F.E.R.C.,*
  460 F.3d 53 (D.C. Cir. 2006) ............................................................................6

*Conner v. Burford,*
  848 F.2d 1441 (9th Cir. 1986) ........................................................................25

*In re Consolidated Delta Smelt Cases,*
  No. 1:09-cv-0047 LJO BAM, 2013 WL 1455592 (E.D. Cal. Apr. 9, 2013) .........24

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
  698 F.3d 1101 (9th Cir. 2012) ...............................................................2, 15, 19

*Ctr. for Envtl. Health v. Vilsack,*
  No. 15-cv-01690-JSC, 2016 WL 3383954 (N.D. Cal. June 20, 2016) .............14, 17

*Ctr. for Food Safety v. Vilsack,*
  734 F. Supp. 2d 948 (N.D. Cal. 2010) .............................................................19

*Defs. of Wildlife v. U.S. Envtl. Prot. Agency,*
  420 F.3d 946 (9th Cir. 2005) ..........................................................................15

**Federal Cases (Cont'd)** Page(s)

*Ellis v. Housenger,*
    No. 13-CV-01266-MMC, 2017 WL 1833189 (N.D. Cal. May 8, 2017)................................11

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998)............................................................................................14

*Heartland Reg'l Med. Ctr. v. Sebelius,*
    566 F.3d 193 (D.C. Cir. 2009)............................................................................17

*Humane Soc'y of U.S. v. Locke,*
    626 F.3d 1040 (9th Cir. 2010)................................................................14, 15, 18

*Idaho Farm Bureau v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995)........................................................................18, 19

*Intertribal Sinkyone Wilderness Council v. NMFS,*
    No. 1:12-cv-00420 NJV, 2013 WL 8374150 (N.D. Cal. Nov. 26, 2013).................24, 25

*Karuk Tribe of California v. U.S. Forest Serv.,*
    681 F.3d 1006 (9th Cir. 2012) ............................................................. *passim*

*Lane Cty. Audubon Soc'y v. Jamison,*
    958 F.2d 290 (9th Cir. 1992) ..............................................................................10

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.,*
    575 F.3d 999 (9th Cir. 2009) ..........................................................................2, 16

*Massachusetts v. E.P.A,*
    549 U.S. 497 (2007)..........................................................................................22

*N. Plains Res. Council v. Surface Transp. Bd.,*
    668 F.3d 1067 (9th Cir. 2011) ............................................................................19

*Nat. Res. Def. Council v. Envtl. Prot. Agency,*
    857 F.3d 1030 (9th Cir. 2017) ................................................................15, 17, 23

*Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency,*
    676 F. Supp. 2d 307 (S.D.N.Y. 2009)..............................................................17, 23

*Nat. Res. Defense Council v. U.S. Dep't of Interior,*
    275 F. Supp. 2d 1136 (C.D. Cal. 2002) ..............................................................19

*Nat. Resources Def. Council v. Evans,*
    243 F. Supp. 2d 1046 (N.D. Cal. 2003)..............................................................24

*Nat'l Parks Conservation Ass'n v. Jewell,*
    62 F. Supp. 3d 7 (D. D.C. 2014)..........................................................................17

**Federal Cases (Cont'd)**                                      **Page(s)**

*Nat'l Res. Def. Council v. Houston,*
    146 F.3d 1118 (9th Cir. 1998) .......................................................19

*Nat'l Wildlife Fed. v. NMFS,*
    524 F.3d 917 (9th Cir. 2014) ....................................................24, 25

*Pac. Rivers Council v. Thomas,*
    30 F.3d 1050 (9th Cir. 1994) ...............................................2, 10, 13

*In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litig.,* 818
    F.Supp.2d 214 (D.D.C. 2011) .....................................................14

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency,*
    806 F.3d 520 (9th Cir. 2015) .............................................. *passim*

*Rocky Mt. Farmers Union v. Corey,*
    740 F.3d 507 (9th Cir. 2014) .......................................................22

*Se. Alaska Conservation Council v. Fed. Highway Admin.,*
    649 F.3d 1050 (9th Cir. 2011) .....................................................19

*Thomas v. Peterson,*
    753 F.2d 754 (9th Cir. 1985) .......................................................16

*TVA v. Hill,*
    437 U.S. 153 (1978)..........................................................11, 12, 17

*Vill. of False Pass v. Clark,*
    733 F.2d 605 (9th Cir. 1984) .......................................................14

*W. Oil and Gas v. U.S. Envtl. Prot. Agency,*
    633 F.2d 803 (9th Cir. 1980) .......................................................18

*W. Watersheds Project v. Kraayenbrink,*
    632 F.3d 472 (9th Cir. 2011) ...................................................2, 10

*Washington Toxics Coalition v. EPA,*
    No. C01-132C, 2002 WL 34213031 (W.D. Wash. July 2, 2002).........................24

**Federal Statutes**                                           **Page(s)**

5 U.S.C. § 706................................................................14

5 U.S.C. § 706(2).............................................................14

5 U.S.C. § 706(2)(A)..........................................................14

7 U.S.C. § 136n(b)............................................................14

16 U.S.C. § 1536(a)(2).................................................2, 6, 11, 12

**Regulations**                                                                                             **Page(s)**

50 C.F.R. §§ 402.12-402.16 ................................................................................16

50 C.F.R. §§ 402.13, 402.14 ..............................................................................13

50 C.F.R. § 402.13(a) .......................................................................................2, 13

50 C.F.R. § 402.14(a) ................................................................................2, 3, 6, 11

50 C.F.R. § 402.14(b) .......................................................................................2, 13

50 C.F.R. § 402.14(h)(3), (i) ................................................................................3

**Federal Register**                                                                                        **Page(s)**

79 Fed. Reg. 55874, 55906 (Sept. 17, 2014) ........................................................7

79 Fed. Reg. 59992, 60012 (Oct. 3, 2014) ...........................................................7

79 Fed. Reg. 63672, 63737 (Oct. 24, 2014) .........................................................7

80 Fed. Reg. 17974, 18003 (Apr. 2, 2015) ...........................................................7

82 Fed. Reg. 3186, 3190 (Jan. 11, 2017) ..............................................................6

**Other Authorities**                                                                                       **Page(s)**

B.A. Woodcock et al., *Country-specific Effects of Neonicotinoid Pesticides on
    Honey Bees and Wild Bees*, Science 356, 1393-1395 (2017),
    https://goo.gl/pvyE6x ...............................................................................21

C. H. Krupke et al., *Planting of Neonicotinoid-treated Maize Poses Risks for
    Honey Bees and Other Non-target Organisms Over a Wide Area Without
    Consistent Crop Yield Benefit*, 54 J. Applied Ecology 1449 (2017),
    https://goo.gl/hhfVJ6 ................................................................................21

E. A. D. Mitchell et al., *A Worldwide Survey of Neonicotinoids in Honey*, 358
    Science 109 (2017), http://science.sciencemag.org/content/358/6359/109.full ...................21

EPA, Preliminary Bee Risk Assessment to Support the Registration Review of
    Clothianidin and Thiamethoxam (Jan. 5, 2017),
    https://www.regulations.gov/document?D=EPA-HQ-OPP-2011-0865-0173 .......................11

EPA, Reduced Risk and Organophosphate Alternative Decisions for Conventional
    Pesticides, https://www.epa.gov/pesticide-registration/reduced-risk-and-
    organophosphate-alternative-decisions-conventional (last visited Oct. 9, 2017) ...................22

**Other Authorities (Cont'd)** **Page(s)**

FWS, Draft Revised Recovery Plan for the Northern Great Plains Piping Plover,
    36 (Mar. 2016), https://www.fws.gov/mountain-prairie/es/species/birds/
    pipingplover/2016/Vol%20I%20NGP%20Draft%20Revised%20Breeding%
    20Rec%20Plan.pdf..................................................................................................7

Jacob R. Pecanka & Jonathan G. Lundren, *Non-target Effects of Clothianidin on
    Monarch Butterflies*, Science of Nature 102:19 ) (2015),
    https://goo.gl/92mua8. ........................................................................................21

Myers, C and E Hill., *Memorandum: Benefits of Neonicotinoid Seed Treatments
    to Soybean Production*, EPA (Oct. 15, 2014),
    https://www.epa.gov/sites/production/files/2014-10/documents/benefits_
    of_neonicotinoid_seed_treatments_to_soybean_production_2.pdf.......................20

Olivier Samson-Roberts et al., *Planting of Neonicotinoid-coated Corn Raises
    Honey Bee Mortality and Sets Back Colony Development*, PeerJ (2017),
    https://peerj.com/articles/3670/.........................................................................21

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendant Environmental Protection Agency (EPA) violated the Endangered Species Act (ESA) in approving fifty-nine of Defendant-Intervenors' pesticide products, over many years. In approving these products, EPA failed to abide by the ESA's consultation requirements—the "heart" of the ESA—the process by which agencies carry out the ESA's substantive mandate to protect the nation's threatened and endangered species from extinction. As such, EPA's violations of law may jeopardize many hundreds of endangered species, ranging from the tall and graceful whooping cranes to delicate and spectacular butterflies, such as the Palo Verdes blue and the Dakota skipper, as well as their designated critical habitat.

Accordingly, pursuant to the Court's Summary Judgment opinion and order, Plaintiffs seek the following remedies for EPA's violations of law. First, the Court should declare that, based on the record before it, the unlawfully approved pesticides "may affect" endangered species, and thus hold that EPA was required to undertake ESA consultation with the expert wildlife agencies prior to their approval. Then, because of the agency's serious and long-standing violations of bedrock ESA law, the Court should vacate the pesticide approvals until and unless EPA complies with the ESA.

**ARGUMENT**

**I.    THE COURT SHOULD ISSUE DECLARATORY RELIEF THAT THE "MAY AFFECT" THRESHOLD IS MET FOR THE PESTICIDES.**

In its Summary Judgment Opinion, after finding for Plaintiffs on the issue of ESA liability, the Court refrained from addressing whether to "direct the EPA to engage in consultation or only direct the EPA to determine whether it should engage in consultation," since the "sole issue" before the Court then was the issue of liability. Order, ECF No. 269 at 26 n.19. Accordingly, Plaintiffs' renew their position that the former is fully warranted and ask the Court to declare that the low "may affect" threshold requiring consultation is met. The evidence is overwhelming and the Court should not permit any further unilateral delay or decision-making by EPA, without the involvement of the expert wildlife services. Remanding without such relief will cause further unnecessary delay and protracted risks to protected species, contrary to the ESA's fundamental purpose and mandates.

## A.     The "May Affect" Threshold Requiring Consultation Is Met Here.[1]

The ESA mandates that "[e]ach federal agency" must "insure" its action—here, EPA's registration of the product and use approvals at issue—will not "jeopardize the continued existence" of any species. 16 U.S.C. § 1536(a)(2) (Section 7(a)(2)). Section 7's substantive mandates to insure against jeopardy are carried out through its procedural consultation requirements, known as the "heart of the Endangered Species Act," *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009), which require that agencies enter into consultation with the expert wildlife agencies for any decision that "may affect" protected species or their habitat. 50 C.F.R. § 402.14(a); *see* ECF No. 226 at 8-10.

As the Ninth Circuit has repeatedly instructed, the standard for whether EPA's action "may affect" a species or critical habitat, triggering consultation, is extremely low: "[A]ctions that have *any chance of affecting* listed species or critical habitat—even if it is later determined that the actions are 'not likely' to do so—require at least some consultation under the ESA." *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (emphasis added). "*Any possible effect,* whether beneficial, benign, adverse or of an undetermined character" triggers the requirement. *Id.* (quoting *Lockyer*, 575 F.3d at 1018-19) (emphasis in *Lockyer)* (quoting 51 Fed. Reg. 19,926, 19,949 (June 3, 1986)); *accord. W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012).

Thus, if EPA's pesticide registrations have "any chance" of having "any possible effect" on *any* listed species or critical habitat, EPA *must* enter into consultation. 50 C.F.R. § 402.14(a).[2]

---

[1] Plaintiffs thoroughly briefed the "may affect" standard at summary judgment and thus in the interests of judicial efficiency and economy here incorporate by reference and renew those arguments and their supporting citations, record materials, and expert extra-record materials, summarized here. *See* ECF No. 226 at 7-24 (and citations therein); ECF No. 244 at 9 n.7, 18-25 (and citations therein).

[2] Consultation can initially be "informal," 50 C.F.R. §§ 402.14(a), (b); 402.13(a), and can end without formal consultation, but only if the relevant expert wildlife agency concurs, in writing, that EPA's action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(a), 402.14(b)(1); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n.8 (9th Cir. 1994). Otherwise, EPA must engage in formal consultation. *Id.* at 1054 n.8; 50 C.F.R.

1    Here, the evidence is overwhelming that this low bar is met. *See* ECF No. 226 at 12-24.

2         <u>First</u>, the Administrative Record (AR) is rife with evidence showing EPA's own

3    admissions of potential harm to hundreds of ESA-protected species. *Id.* at 12-17. Numerous EPA

4    risk assessments included admissions far beyond and well above "any chance" of having "any

5    possible effect."

6         For example, for clothianidin seed coatings for corn and canola—one of the broadest

7    clothianidin uses—EPA unambiguously concluded that these products were "*expected* to present

8    acute and/or chronic toxicity risk to endangered/threatened birds and mammals via possible

9    ingestion of treated corn and canola seeds." AR43555 (emphasis added); *see* ECF No. 226 at 12-

10   13 (and other AR citations therein); ECF No. 216-12 (AR75066 at 16). And that, because of

11   these clothianidin products, "endangered/threatened invertebrates *may be impacted* via residue

12   laden pollen and nectar." AR43555 (emphasis added); ECF No. 216-12 (AR75066 at 16).

13        Moreover, in the agency's risk assessment for these products, AR43538-627, EPA further

14   concluded that "the Agency's level of concern for endangered and threatened birds, mammals

15   and nontarget insects *is exceeded* for the proposed use of clothianidin on corn and canola."

16   AR43540 (emphasis added). For ESA-protected mammals and birds, the agency expressed

17   "concern" regarding "reproductive and developmental effects," while for ESA-protected insects,

18   the agency expressed "uncertainty regarding potential chronic effects." AR43540; *see also*

19   AR43539 (EPA assessment shows exposure to treated seeds "may result in chronic toxic risk" to

20   "endangered small birds" as well as "acute/chronic toxicity risk" to "endangered mammals").

21   Similarly, EPA concluded that clothianidin products for use on tobacco, turf, apples, pears, and

22   ornamental plants "*may be of concern*" to endangered aquatic invertebrates and that "endangered

23   beneficial insects *may be at risk.*" ECF No. 266 at 13-14 (citing AR43634-43635, other AR

24   citations therein) (emphases added).

25        Because these products cover such wide geographic areas, and have no ESA restrictions

26   _____

27   § 402.14(a). Formal consultation results in the Service preparing a Biological Opinion, providing
     its expert opinion on whether EPA's action is likely to jeopardize the continued existence of any
     species or adversely modify any designated critical habitat, and authorizes any incidental harm,
28   or "take." 50 C.F.R. § 402.14(h)(3), (i).

1   on their use, often in the record EPA simply listed dozens and sometimes over a hundred ESA-

2   protected species in graphs entitled "*affected ESA-protected species*." *Id.* at 14 & n.13 (emphasis

3   added) (and AR citations therein); *see also* AR43675-78, AR43720-26, AR43789-93). Over and

4   over again, EPA used similar phrases for ESA-protected species—"may be of concern," "may be

5   at risk"—in risk assessments for crop uses of clothianidin, including uses such as the products at

6   issue here. *Id.* at 14-15; *see also* AR43878 (use on sugar beets exceed endangered species acute

7   risk to birds and acute and chronic risk to birds & mammals).

8        The same was true for the thiamethoxam crop use risk assessments: the record includes

9   repeated EPA statements far above the low "may affect" threshold. For example, for citrus fruits

10  and tree nuts, a broad crop categories covering many fruit and nut uses, AR43031, and covering

11  broad swaths of the United States, AR43032 (Figs. 1 & 2), for which EPA has approved many

12  products since 2007 without consulting, the AR risk assessment tables list hundreds of ESA-

13  protected species "on which direct and indirect effects *are expected to occur* from the proposed

14  new thiamethoxam uses." *Id.* at 15; *see, e.g.* AR43060-61, Table 29 (listing by State 290-ESA

15  protected species "with direct effects" and 948 species "with indirect effects.") (emphasis

16  added).[3] EPA's assessment for those uses concluded in the "Listed Species Assessment" that

17  they show "the possibility for direct effects to listed aquatic invertebrates (due to acute

18  exposure), birds (due to dose-based exposure), and mammals (chronic dose-based exposure)."

19  AR43025 (and Table 1). In addition, "terrestrial-phase amphibians and reptiles" are "also at

20  *direct risk* from new uses of thiamethoxam." *Id*. (emphasis added); *and see id.* (Table 1 listing

21  multiple categories of Listed Taxa at risk from direct or indirect effects, including birds, fish,

22

---

23  [3] The record includes many such tables listing potentially affected ESA species for other

24  thiamethoxam uses. *See e.g.* AR43312-410 (for seed treatments for corn, carrots and other crops, table appendix listing by state individual ESA-protected species potentially affected in each

25  state, totaling many hundreds), AR42673, Table 4 (for use on berries, vegetables and turfgrass, listing "*Federal Listed and Endangered Species At Risk from Thiamethoxam Usage*" showing

26  direct and/or indirect effects to numerous taxa, including *inter alia*, birds, amphibians, reptiles, mammals, and crustaceans). Appendix E includes a species count by state for all the indicated

27  crops, AR42788, showing where ESA-protected species, by taxa, "co-occur with the indicated crops," AR42788-42794, and then listing all species by State, AR42794-42830, totaling 894

28  species.

1    mammals, and various kinds of invertebrates).

2         Similarly, for other thiamethoxam uses EPA also found that a number of ESA-protected

3    species "*will potentially be affected* from thiamethoxam usage on the crops proposed." ECF No.

4    226 at 17 (and AR42673, other AR citations therein) (emphasis added). The record included still

5    more risk assessments concluding that the "*possibility for direct effects* to listed aquatic

6    invertebrates," and "*direct risk* from new uses of thiamethoxam," and that "potential for adverse

7    effects to those [ESA-listed] species … cannot be precluded." *Id.* at 15 (and AR43059-60, other

8    AR citations therein) (emphases added). Indeed, for an approval of thiamethoxam use on rice *in

9    just Arkansas*, EPA found a total of twelve protected species may be affected, and that "direct

10   *effects are expected to result* on five species" and "indirect *effects are expected to occur* on three

11   species." AR42404 (emphases added); *see also* AR42418, AR42425-42426.[4]

12        Based on these agency admissions, just as the Ninth Circuit held in *Karuk Tribe*, the

13   "may affect" threshold can be resolved here as a "textual matter." 681 F.3d at 1027. There, the

14   Forest Service admitted the mining activities "might cause" disturbance to protected salmon

15   habitat, and the Court gave that phrase its "ordinary meaning," holding that a "may affect"

16   conclusion had to follow "almost automatically," and ordering consultation. *Id.* The exact same

17   is true of EPA's repeated admissions on this record.

18        Faced with its own conclusions, EPA made several errors rather than consulting, such as

19   substituting an inflated legal standard for "may affect," ECF No. 226 at 17-18 & n.19 (and AR

20   citations therein, *e.g.* AR43631, AR43793, AR43745), or conflating the low "may affect" ESA

21   standard for triggering consultation with its own FIFRA "level of concern," improperly

22   increasing the level of impact EPA believed was necessary to trigger consultation, *id.* at 19-20 &

23   n.22 (and AR citations therein, .*e.g.*, AR43540, AR42426, AR43025). EPA's substitution of its

24   FIFRA "level of concern" violates the ESA "may affect" standard by definition, because while

25   the "level of concern" assumes there is a level of risk that is acceptable, the "may affect"

---

[4] The five species with direct effects expected were the pink mucket, scaleshell mussel, fat
pocketbook pearly mussel, Ouachita rock-pocketbook, and Arkansas fatmucket. *Id.* The three
with expected indirect effects include the pallid sturgeon, red-cockaded woodpecker, and gray
bat. *Id.* at AR42426.

standard requires consultation to begin for *any* effect. *Karuk Tribe*, 681 F.3d at 1027; 50 C.F.R. §

402.14(a). Importantly, EPA has no statutory charge or expertise in endangered species issues;

that is the wildlife agencies' bailiwick, as required by Congress, and why the consultation

process is structured as it is. 16 U.S.C. § 1536(a)(2); *City of Tacoma v. F.E.R.C.*, 460 F.3d 53, 75

(D.C. Cir. 2006) ("This interagency consultation process reflects Congress's awareness that

expert agencies (such as the Fisheries Service and the Fish and Wildlife Service) are far more

knowledgeable than the other federal agencies about the precise conditions that pose a threat to

listed species.").

        Second, even though EPA has unlawfully failed to involve them in its assessment

process, the Fish and Wildlife Service, the expert agency that, unlike EPA, does administer the

ESA, has on its own recognized the impacts of these pesticides on numerous protected species.

For example and most recently, FWS concluded in January that the neonicotinoid pesticides

clothianidin and thiamethoxam "have been strongly implicated" in the "precipitous decline" of

the rusty patched bumble bee. 82 Fed. Reg. 3186, 3190 (Jan. 11, 2017). Because rusty patched

bumble bees are ground nesting, the Service specifically singled out the impacts of neonicotinoid

seed treatment products for use on corn and soybean seeds, the same types of products at issue in

this case. *Id.* at 3201.[5] The Service went on to conclude that, while there are numerous causes of

the bees' decline, "lethal and sublethal effects to bees have been documented for this class of

chemicals, so it is reasonable to think that they *likely are contributing to the decline*." *Id.* at 3198

(emphasis added). The Service concluded in the final listing that the "risk of extinction is

currently high" and that "[p]esticide use, including the use of many insecticides that have known

lethal and sublethal effects to bumble bees, is occurring at increasing levels rangewide." *Id.* at

3205.

---

[5] Of the fifty-nine products at issue, twenty-seven are seed coating products. Of those, more than
half, or fifteen products, are for the corn and soybean uses that the FWS highlights, *i.e.*
Clothianidin: INOVATE Neutral Seed Protectant; INOVATE Seed Protectant; Poncho 600;
Poncho/VOTiVO; V-10170 5 FS Insecticide. Thiamethoxam: Adage Deluxe; Adage Premier;
Avicta Complete Corn 250; Avicta Complete Corn 500; Avicta Duo; Avicta Duo 250;
CruiserMaxx EZ; Four-Way VAP; THX/MXM/FD L CZ; THX_MXM_F DL_TBZ FS. *See*
Second Amended Complaint, App.s A and B; ECF No. 126-1 and 126-2.

FWS has made similar findings for other species. In listing the Poweshiek skipperling and Dakota skipper under the ESA in October 2014, FWS emphasized the impacts of neonicotinoid pesticides such as thiamethoxam and clothianidin products and their seed treatments. 79 Fed. Reg. 63672, 63737 (Oct. 24, 2014).[6] In deciding not to delist the valley elderberry longhorn beetle in 2014, FWS explained that neonicotinoids were used extensively in California and were "particularly toxic to insects in small quantities." 79 Fed. Reg. 55874, 55906 (Sept. 17, 2014). After discussing neonicotinoids studies showing harmful exposure effects, FWS concluded that "pesticides are likely present in areas around and adjacent to valley elderberry longhorn beetle habitat," and that "the timing of pesticide applications are also likely to coincide with vulnerable life stages of the" beetle. *Id.* (concluding that "pesticide impacts to the species and its habitat are likely"). In drafting a 2016 recovery plan for the endangered piping plover, FWS also discussed neonicotinoids, saying that more analysis was needed of risks, but that use of the insecticides could well be having a negative effect on the entire piping plover population.[7] FWS has also recently recognized neonicotinoid seed-coatings as a threat to the ESA-listed western yellow-billed cuckoo,[8] and that neonicotinoid products are a contaminant of concern for the northern long-eared bat.[9]

> Finally, that is not all: in addition to EPA's own admissions and these other governmental sources, Plaintiffs also introduced significant expert evidence in support of a "may affect"

---

[6] "The use of neonicotinoids on agricultural crops has dramatically increased in the last ten years and they are now the most widely used group of insecticides in the world. Neonicotinoids persist in the environment and are thought to accumulate in the soil from repeated applications over time. Insects can be exposed through multiple routes—neonicotinoids are used in seed dressings, foliar spray, soil irrigation water, soil drench, granular in pastures, tree injections, and topical applications to pets." *Id.* at 63737 (internal citations omitted).

[7] FWS, Draft Revised Recovery Plan for the Northern Great Plains Piping Plover, 36 (Mar. 2016), https://www.fws.gov/mountain-prairie/es/species/birds/pipingplover/2016/Vol%20I%20NGP%20Draft%20Revised%20Breeding%20Rec%20Plan.pdf.

[8] FWS, Determination of Threatened Status for the Western Distinct Population Segment of the Yellow-billed Cuckoo (*Coccyzus americanus*), 79 Fed. Reg. 59992, 60012 (Oct. 3, 2014).

[9] FWS, Threatened Species Status for the Northern Long-Eared Bat With 4(d) Rule, 80 Fed. Reg. 17974, 18003 (Apr. 2, 2015).

conclusion: three eminently qualified scientific experts, in directly relevant fields of avian and invertebrate toxicology, providing six lengthy declarations. ECF No. 226 at 20-24 (and citations therein). The experts identified a non-exhaustive total of eleven case study species that easily triggered the may affect threshold for entering consultation. *Id.* at 21 & n.24 (and citations therein). These include four bird species (Mississippi sandhill crane, whooping crane, Attwater's prairie chicken, and the southwestern willow flycatcher); two butterflies (Palos Verdes blue butterfly and the Dakota skipper); two beetles (Casey's June beetle and the Salt Creek tiger beetle); and two other invertebrates (Nashville crayfish and Hines emerald dragonfly). *Id.* The experts came to their conclusions based on scientific literature reviews, their many years of expertise in their fields, pertinent peer-reviewed and published studies, government statistics and reports (such as those from expert FWS), and the pesticide product labels. ECF No. 204 at 10-11, 14-16. The experts analyzed and applied the geographical scope of the product uses with the habitats of selected ESA-protected birds and insects, finding overlap or co-location with these pesticide uses, but also went much further, to examine direct and indirect harmful effects, such as exposures through off-site movement like water contamination, or reduction in food sources, and toxicity of clothianidin and thiamethoxam to these species. *Id.* at 22-24 (and citations therein). For example, Dr. Mineau calculated the number of neonicotinoid-coated seeds each bird would need to consume before experiencing harmful effects. ECF No. 226 at 23 (and citations therein). Dr. Stark reviewed toxicity studies for several species related to his case study invertebrates, finding that clothianidin and thiamethoxam are highly toxic to these proxy species. *Id.* at 23 (and citations therein). Finally, Plaintiffs' experts testified that the foreseeable impacts to protected species were in no way limited to just their case studies: many other ESA-protected species are also likely to be similarly harmed by the clothianidin and thiamethoxam products at issue. *Id.* at 23-24 (and citations therein).

   In response, EPA submitted no contrary expert evidence, like agency scientists, attempting to dispute Plaintiffs' experts' conclusions or arguing "no effect," the only conclusion sufficient to avoid ESA consultation. Intervenors did submit expert testimony, but their experts did *not* contradict Plaintiffs experts' "may affect" conclusions; that is, they declined to testify

there would be "no effect" to ESA-protected species. *Id.* at 24 & n.29-30 (and citations therein). As the Court held in its order denying the Intervenors' *Daubert* motion, ECF No. 209 at 3, "Intervenors have not identified any document in the administrative record that sets forth the facts found by the EPA to support a conclusion that the subject products would have no effect on an endangered or threatened species, nor have Intervenors otherwise identified any such facts. Further, the Court has not itself located any document in the administrative record that sets forth such facts." Thus the record is fully developed and overwhelmingly shows that the low bar for "may affect" is easily surpassed by EPA's challenged decisions.

> **B.    The Court Should Hold the "May Affect" Threshold Met and Need Not Give EPA Further Time to Delay or Avoid Consultation.**

Defendants will ask the Court to remand back to EPA, without making a "may affect" determination, because EPA delayed and avoided itself making any formal "may affect-no effect" determinations to this point and instead just ignored its ESA duties. EPA will likely want years just to issue a formal ESA "may affect-no effect" decision, and thus put off the consultation process with the Services until after that, and its conclusion until many years after that. The Court should not reward the agency's violations of law with more time, leeway, and room for more malfeasance.

*Karuk Tribe* teaches that non-ESA agency documents and admissions—even without any underlying formal agency ESA "may affect-no effect" determination—can be used to show the low "may affect" bar is met. *See supra*. In *Karuk Tribe* the Forest Service had not made any underlying formal ESA determination on "may affect-no effect" in the first instance. The intervenor miners vigorously challenged that the "may affect" threshold was triggered, arguing that the record was "devoid of any evidence the mining activities may affect coho salmon." *Karuk Tribe*, 681 F.3d at 1027. The Ninth Circuit, sitting *en banc* and analyzing the record before it, held that the miners' arguments did not "withstand[] scrutiny," and went on to rely on record evidence to make an affirmative "may affect" finding. *Id.* at 1028 ("The record in this appeal includes ample evidence that the mining activities approved under the NOIs in the Happy Camp District 'may affect' coho salmon and their critical habitat."). In addition, the Court

1  pointed to admissions by the agency in related, but non-ESA contexts—just as here—of possible

2  or likely harm to protected species and the inherently damaging nature of the activity. *Id.* at 1027

3  ("Whether the mining activities approved by the Forest Service in this case 'may affect' critical

4  habitat of a listed species can almost be resolved as a textual matter. … If the phrase 'might

5  cause' disturbance of fisheries habitat is given an ordinary meaning, it follows almost

6  automatically that mining pursuant to the approved NOIs 'may affect' critical habitat of the coho

7  salmon.").[10] *See, e.g., Lane Cty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992)

8  (affirming injunction halting timber sales pending completion of consultation, determining that

9  the "may affect" threshold was triggered and not remanding to the agency to make that initial

10  determination first); *Pacific Rivers Council*, 30 F.3d at 1055 (analyzing record evidence in

11  concluding the challenge actions "may affect" protected salmon).

12      Thus the guidance of *Karuk Tribe* is that courts are perfectly capable of looking at the

13  record before them and determining whether "may affect" is met when the agency has avoided

14  making an actual ESA finding itself. This is particularly the case where, as enumerated above

15  and in *Karuk Tribe*, the agency has otherwise admitted potential harm to protected species in its

16  own non-ESA risk assessments (as repeatedly shown in this AR), but still avoided making the

17  required ESA decision and starting consultation. To so order would not be to prejudge or

18  preempt the agency's process: the process in question is the consultation process, and the Court

19  would be simply ordering that EPA can no longer unilaterally avoid or delay it, not dictating

20  what its outcome must be.

21      **C.**    **Failure to Order Consultation Would Leave Protected Species At Further**

22             **Risk.**

23      This relief matters because without it EPA would be left to its own unilateral process, on

24  its own timeline, to just make an *initial* "may affect-no effect" determination whether to enter

25  consultation. Unnecessary delay of that decision would further delay the subsequent consultation

---

26  [10] Similarly, as the Ninth Circuit held in *Western Watersheds*, 632 F.3d at 496, the "sheer

27  number of acres affected" by agency decisions of nationwide magnitude such as the decisions
here can "alone suggest" it "may affect" listed species. *Western Watersheds* also upheld the
reliance on expert testimony to support "may affect," as Plaintiffs' experts presented here. *Id.* at

28  497-498.

1  process and its eventual resolution, and thus extend unanalyzed and unaddressed risks to

2  endangered species even longer.

3      The time elapsed already is important context: EPA has already had an unconscionable

4  amount of time to make this decision. EPA never made any ESA determination for any of the

5  fifty-nine clothianidin and thiamethoxam products at issue in this case, approvals spanning back

6  the past *decade*, to 2007. And EPA approved the prior clothianidin products and thiamethoxam

7  products years before those, the first ones in 2003 and 2000 respectively. *See* ECF No. 126 at 26.

8  So it has been *seventeen* years total that the agency has avoided any ESA determination

9  whatsoever. EPA has failed to address this pressing and basic duty despite these pesticides being

10  in widespread use, covering all major U.S. commodities and vegetable and fruit crops, as well as

11  other landscaping uses, being used on 90-120 million acres as seed treatments alone.[11] EPA also

12  had a chance to make such a decision in the course of this case, to attempt to rebut Plaintiffs'

13  "may affect" evidence and arguments, and again declined to do so.

14      The ESA does not countenance this harm *first*, consult *after* approach. *See* 16 U.S.C.

15  § 1536(a)(2); 50 C.F.R. § 402.14(a). Indeed, as the Court explained in its summary judgment

16  opinion, the ESA consultation regulations require that agencies determine "*at the earliest

17  possible time*" whether "any action may affect listed species or critical habitat." *Ellis v.

18  Housenger*, No. 13-CV-01266-MMC, 2017 WL 1833189, at *10 (N.D. Cal. May 8, 2017)

19  (emphasis added) (quoting 50 C.F.R. § 402.14(a)). In waiting until litigation has finally forced it

20  to face this issue, EPA has done the exact opposite of what the regulations require.

21      While the agency may claim resource limitations or other duties, the Court should not

22  permit the agency to unnecessarily delay even further, when the ESA's "consultation

23  requirement reflects 'a conscious decision by Congress to give endangered species priority over

24  the primary missions of federal agencies.'" *Karuk Tribe*, 681 F.3d at 1020 (quoting *TVA v. Hill*,

25  437 U.S. 153, 185 (1978)). The Supreme Court emphasized in *TVA v. Hill* that "one would be

26

27  _____

    [11] EPA, Preliminary Bee Risk Assessment to Support the Registration Review of Clothianidin

28  and Thiamethoxam (Jan. 5, 2017), https://www.regulations.gov/document?D=EPA-HQ-OPP-
    2011-0865-0173.

1   hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the

2   [ESA]." 437 U.S. at 173. Section 7—the *TVA* Court's platonic ideal of a "plain" statutory

3   mandate—instructs that "[e]ach Federal agency shall, in *consultation with and with the*

4   *assistance of the Secretary* [the expert wildlife agencies], insure that any action authorized,

5   funded, or carried out by such agency [] is not likely to jeopardize the continued existence of any

6   endangered species …" 16 U.S.C. § 1536(a)(2) (emphasis added). Accordingly it could not be

7   "any plainer" that the ESA's emphasis is on protecting species through requiring the

8   involvement of the expert agencies going forward—Plaintiffs' proposed remedy—and against

9   further delay and further unilateral decision-making by EPA without consultation. Indeed,

10  holding that "may affect" is already met would *save* EPA resources, in that it would involve the

11  Services sooner, and not require EPA to undertake further assessment alone.

12          In addition to further delay, if given the chance there is also a risk that EPA would

13  attempt to ratchet down its admissions on this record, and try to transpose them into a "no effect"

14  decision unilaterally, avoiding consultation with the Services, despite the ESA's low threshold

15  standards and the overwhelming evidence that threshold is triggered. Indications of this likely

16  possibility can be seen at places in the record where EPA substituted its FIFRA-based "levels of

17  concern," effects that EPA believed were meaningful by its own metrics, instead of using the

18  ESA's low bar of "any possible effect" standard. *See supra* pp. 5-6 (and citations therein).

19  However EPA's "level of concern" about an effect is not the ESA threshold for consultation—

20  "any possible effect" is.

21          As simply an "action agency" under the ESA, EPA enjoys no special status. Congress did

22  not intend every (or any) federal agency to develop its own consultation standard, based on its

23  own "level of concern," decide for itself whether its action's effects are "of concern," and

24  consult the expert agencies only if it decides effects reach levels concerning enough. Rather,

25  consultation is required where there is "[a]ny possible effect, whether beneficial, benign,

26  adverse, or of an undetermined character…." *Karuk Tribe*, 681 F.3d at 1027. A "no effect"

27  outcome on remand would then require even more public interest litigation by Plaintiffs, again,

28  just to get consultation to begin.

1    Practically, the fifty-nine pesticide products in this case are not the only ones at issue. As
2    the record shows, EPA has long engaged in a pattern and practice of delay and ignoring the ESA
3    with regards to its pesticide decisions, and this Court's decision whether or not to permit further
4    delay by the agency will undoubtedly provide legal guidance to the agency on what is lawful for
5    future similar decisions, for after these pesticides are vacated, *see infra*, if they are then re-
6    approved, or for other substantially similar pesticides. Moreover, as the Court explained in its
7    standing analysis of the summary judgment opinion, ECF No. 269 at 26, completed consultation
8    on these specific clothianidin and thiamethoxam products could provide precedential grounds
9    warranting action on other similar neonicotinoid products.

10   Finally, as *Karuk Tribe* underscores, "the burden imposed by the consultation
11   requirement need not be great," 681 F.3d at 1029, since consultation may be formal or informal,
12   *see* 50 C.F.R. §§ 402.13, 402.14. EPA and FWS potentially could address some possible species
13   risks through informal consultation, without a Biological Opinion and formal consultation, as
14   long as the expert wildlife agency concurred in any "not likely to adversely affect" decision in
15   writing. 50 C.F.R. §§ 402.13(a), 402.14(b)(1); *see Pac. Rivers Council*, 30 F.3d at 1054 n.8.
16   What matters is the required involvement in the analyses and decision-making by the
17   Congressionally-appointed expert wildlife agencies, and the halting of unilateral decisions by
18   EPA (or supposition by the financially-interested pesticide industry), for risks to endangered
19   species. *Karuk Tribe*, 681 F.3d at 1029 ("Congress made a conscious decision in the ESA to
20   require that federal agencies consult with the expert wildlife agencies, not merely with biologists
21   within their own agencies, about the adverse effects that their actions might have on listed
22   species."). Thus, in order to avoid any further unnecessary delay and prolong risks to endangered
23   species, the Court should declare that the "may affect" threshold requiring consultation has been
24   met for the products at issue in this case.

25   **II.    THE COURT SHOULD VACATE THE PESTICIDE REGISTRATIONS.**

26   The Court should then vacate, or set aside as unlawful, all the pesticide product
27   registrations for which the Court granted Plaintiffs' motion for summary judgment until and
28   unless EPA complies with the ESA.

### A. Vacatur is the Presumptive Remedy and Defendants Have the Burden to Show Why the Unlawful Agency Actions Should Not Be Vacated.

Because the ESA contains no internal standard of review, the Administrative Procedure Act, 5 U.S.C. § 706, governs judicial review of the EPA's actions under the ESA. *See, e.g.*, *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984); *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685-86 (D.C. Cir. 1982). Under the APA, a reviewing court "*shall…hold unlawful and set aside agency action*, findings, and conclusions found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2) (emphasis added).[12] *See also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998) ("If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's action and remand the case—even though the agency (like a new jury after a mistrial) might later, in the exercise of its lawful discretion, reach the same result for a different reason.") (citing *SEC v. Chenery Corp.,* 318 U.S. 80 (1943)). Agency decisions may not be inconsistent with the governing statute. 5 U.S.C. § 706(2)(A) (instructing courts to "set aside" agency action "not in accordance with law."). Thus vacatur and remand is the express, presumptive remedy for an agency action held contrary to law, and as such, the Defendants, not Plaintiffs, carry the burden to show why another result, such as remand without vacatur, is appropriate instead of vacatur. *In re Polar Bear Endangered Species Act Listing and § 4(d) Rule Litig.,* 818 F.Supp.2d 214, 238 (D.D.C. 2011) ("[T]he Supreme Court and the D.C. Circuit have held that vacatur is the presumptive remedy for this type of violation."); *Ctr. for Envtl. Health v. Vilsack*, No. 15-cv-01690-JSC, 2016 WL 3383954, at *13 (N.D. Cal. June 20, 2016) ("given that vacatur is the presumptive remedy for a procedural violation such as this, it is Defendants' burden to show that vacatur is unwarranted").

Accordingly, the Ninth Circuit has authorized remand without vacatur only in "rare" or "limited" circumstances, *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("rare circumstances"); *Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) ("limited circumstances"), and only when the agency can show

---

[12] FIFRA also includes similar "set aside" language. *See* 7 U.S.C. § 136n(b).

that "equity demands" a departure from the presumptive remedy, *Pollinator Stewardship Council*, 806 F.3d at 532 (quoting *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1405–06 (9th Cir. 1995)). *See also Defs. of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005) ("Typically, when an agency violates the Administrative Procedure Act and the Endangered Species Act, we vacate the agency's action and remand to the agency to act in compliance with its statutory obligations.") *rev'd on other grounds Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).

The Ninth Circuit considers if such "rare circumstances" for remand without vacatur are met by "weigh[ing] the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council*, 806 F.3d at 532 (internal quotation marks and citation omitted); *Cal. Communities Against Toxics v. U.S. Envt'l Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012). *See also Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Defendants cannot meet their burden to show that this is one of those rare circumstances where vacatur is not appropriate.

Indeed, courts regularly vacate agency decisions they hold unlawful, including pesticides that were registered without complying with legal standards. *See, e.g.*, *Pollinator Stewardship Council*, 806 F.3d at 532-33 (vacating pesticide registration); *Nat. Res. Def. Council v. Envtl. Prot. Agency*, 857 F.3d 1030, 1042 (9th Cir. 2017) (vacating the pesticide registration); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th Cir. 2012); *Humane Soc'y*, 626 F.3d at 1048, 1053, 1053 n.7. *Pollinator Stewardship Council*, the Ninth Circuit's leading vacatur case, setting out vacatur standards, is exceedingly similar to this case in numerous ways. There, commercial beekeepers and environmentalists similar to the Plaintiffs here challenged EPA's registration of sulfoxaflor, based on shared concerns of grave harm to bee populations. 806 F.3d at 522. Just like the clothianidin and thiamethoxam pesticides at issue here, sulfoxaflor is also a subclass of neonicotinoid pesticides, *id.* at 523, systemic insecticides distributed throughout the plant, tissues, pollen, and nectar. There, as here, EPA's own initial studies showed that the pesticide was "highly toxic to honey bees," and so EPA first proposed only a conditional approval, and ordered the manufacturer, Dow Chemical, to produce more

studies on bee risks. *Id.* at 527. However, a few months later EPA changed its mind and

registered the pesticide unconditionally, without the new studies, but with certain mitigation

measures and a lower application rate. *Id.* at 527-28. The Ninth Circuit held that EPA's decision

was contrary to its own regulations, and that its later justifications could not ameliorate its own

earlier conclusion that the evidence of harm was inconclusive and that more studies were needed.

*Id.* at 530-32 ("By the EPA's own reckoning, the data was insufficient to evaluate the effect of

sulfoxaflor on brood development and long-term colony strength. The decisions are not

consistent. The later, unconditional approval lacks support.").

Addressing the remedy and whether or not to vacate, the Court held that "given the

precariousness of bee populations, leaving EPA's registration of sulfoxaflor in place risks more

potential environmental harm than vacating it." *Id.* at 532. Further, once EPA had followed the

proper process, and obtained the missing studies and considered them, it might reach a different

conclusion, such as a lower application rate, or "that sulfoxaflor cannot be registered at all"

because of its effects on bees. *Id.* at 533.

**B.    Failure to Follow the ESA Consultation Process Is a Very Serious Violation of Law.**

Applying the well-established vacatur test from *Pollinator Stewardship* and other cases,

as to the first factor, the "seriousness of the agency's errors," there is little question that failure to

comply with the ESA's consultation mandates is a very serious error of law. The ESA's

consultation procedure—the procedures that EPA unlawfully avoided here—is the process by

which agencies carry out the ESA's substantive mandate to protect from jeopardy endangered

species. 50 C.F.R. §§ 402.12-402.16; *Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985)

("[T]he strict substantive provisions of the ESA justify *more* stringent enforcement of its

procedural requirements, because the procedural requirements are designed to ensure compliance

with the substantive provisions.") (emphasis in original), *abrogated on other grounds by*

*Cottonwood Env. Law Ctr. v. U.S. Forest Serv.,* 789 F.3d 1075 (9th Cir. 2015). It is hard to

overstate the importance of this process: Section 7 is the very "heart" of the ESA for federal

agencies, *Lockyer*, 575 F.3d at 1018, and as such violating it as EPA did cuts to the quick of the

statute. *See, e.g.*, *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 20-22 (D. D.C. 2014) (holding a failure to consult violation to be a serious error for purposes of vacatur, and vacating the agency action).

Indeed, courts regularly vacate agency decisions for procedural errors of arguably far less importance than a violation of the ESA Section 7, violations of law where the "incalculable" value of endangered species is at risk, *TVA*, 437 U.S. at 187. For example, an agency's procedural failure to undertake lawfully-required public notice and comment of a proposed decision. *Ctr. for Envtl. Health*, 2016 WL 3383954, at *13 (vacating agency approval of use of pesticide-contaminated compost in organic production, for failure to have notice and comment); *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency*, 676 F. Supp. 2d 307, 313-14 (S.D.N.Y. 2009) (vacating a pesticide approval for failure to have notice and comment); *AFL–CIO v. Chao*, 496 F. Supp. 2d 76, 91 (D.D.C. 2007) (holding that "failure to comply with the APA's notice-and-comment requirements is unquestionably a 'serious' deficiency" for purposes of vacatur); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (An agency's "[f]ailure to provide the required notice and to invite public comment ... is a fundamental flaw that 'normally' requires vacatur of the rule").

Moreover, in other pesticide cases, the Ninth Circuit has found EPA's errors sufficiently serious to vacate when EPA failed to address risks of harm of less magnitude. In *Pollinator Stewardship* the Ninth Circuit held the risk of harm to bees, given bees' current "precariousness," sufficient to vacate, even though bees are not (yet) endangered insects. 806 F.3d at 532. And in *NRDC* earlier this spring, the Ninth Circuit summarily vacated a pesticide registration due to EPA's failure to substantiate its finding that the pesticide's use was in the public interest. *NRDC*, 857 F.3d at 1040, 1042. If EPA's failure to follow proper procedures and have the data it needed to make a lawful decision for bees, or to address the public interest, were sufficiently serious errors of law to vacate, surely EPA's failure to follow proper procedures and have the data it needed to make a lawful decision with regards to hundreds of endangered species is sufficiently serious grounds to vacate here. That the agency errors in these cases were FIFRA violations, not ESA violations, further supports that the EPA's violations of law here were even

more serious. There is no longer any question that the challenged actions here were final agency actions triggering EPA's ESA duties, as this Court held. And in those contexts, Congress has made clear that those ESA duties are even more important than EPA's FIFRA duties, not less important. *See Karuk Tribe*, 681 F.3d at 1020 (the ESA's "consultation requirement reflects a 'conscious decision by Congress to give endangered species priority over the primary missions of federal agencies.' ") (quoting *TVA v. Hill,* 437 U.S. at 173). Thus vacatur is even *more* appropriate here. Given Defendants' repeated, longstanding violations of core ESA law, this factor weighs heavily in favor of vacatur.

### C. Consequences of Vacatur Do Not Outweigh Risks to Endangered Species From EPA's Repeated and Long-Standing Violations of The ESA.

As explained above, the Ninth Circuit has considered if the "rare circumstances" for remand without vacatur, *Humane Soc'y*, 626 F.3d at 1053 n.7, are met by "weigh[ing] the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Pollinator Stewardship Council*, 806 F.3d at 532 (internal quotation marks omitted). This is not one of those rare cases: any consequences from vacating the pesticide approvals do not outweigh the seriousness of the agency's repeated violations of law and the risks to endangered species.

<u>First</u>, in environmental cases like this, the "disruptive consequences" the Court considers involve irreparable environmental harm, *not* merely alleged economic harm to industry. That is, the cognizable harm to consider and weigh is harm to the environment that would come from vacatur itself. *See id.* at 532 ("When deciding whether to vacate rulings by the EPA, we consider whether vacating a faulty rule could result in possible environmental harm, and we have chosen to leave a rule in place when vacating would risk such harm."). *See also Idaho Farm Bureau*, 58 F.3d at 1405 ("In the present case, concern exists regarding the potential extinction of an animal species");[13] *W. Oil and Gas v. U.S. Envtl. Prot. Agency*, 633 F.2d 803, 813 (9th Cir. 1980)

---

[13] For example, in *Idaho Farm Bureau*, the Ninth Circuit declined to vacate a rule that had listed the Bruneau hot springsnail as endangered, despite affirming the district court's decision that the FWS had committed procedural errors in its listing decision. 58 F.3d at 1401-05. However, because there were concerns about its extinction—since the snail existed in only a single

1   (same); *Nat. Res. Defense Council v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1143-44

2   (C.D. Cal. 2002) (explaining that Ninth Circuit cases have "expressed special concern for the

3   potentially one-sided and irreversible consequences of environmental damage prompted by

4   vacating defective rules during remand"); *Cal. Communities Against Toxics,* 688 F.3d at 994

5   (remanding without vacating because vacating could lead to air pollution, undermining the goals

6   of the Clean Air Act). "[T]he Ninth Circuit has only found remand without vacatur warranted by

7   equity concerns in limited circumstances, namely serious irreparable environmental injury." *Ctr.*

8   *for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) (providing detailed

9   discussion of vacatur standards and discussing cases).

10        For example, in *Pollinator Stewardship Council*, the Court held that "given the

11   precariousness of bee populations, leaving EPA's registration of sulfoxaflor in place risks more

12   potential environmental harm than vacating it." 806 F.3d at 532. The Court did not consider any

13   economic harm from vacating the pesticide registration, as economic harm does not constitute

14   the "environmental harm" and "limited circumstances" that would overcome a presumption of

15   vacatur. *See id.*

16        By contrast, the Ninth Circuit routinely vacates or approves vacatur of unlawful agency

17   action that has significant economic impacts. *See, e.g.*, *id.* at 532-33 (vacating approval of

18   insecticides); *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1128 (9th

19   Cir. 2012) (vacating decision to authorize 678-mile natural gas pipeline); *N. Plains Res. Council*

20   *v. Surface Transp. Bd.*, 668 F.3d 1067, 1072, 1100 (9th Cir. 2011) (vacating approvals that

21   would have authorized construction of 130-mile railroad to haul coal); *Se. Alaska Conservation*

22   *Council v. Fed. Highway Admin.*, 649 F.3d 1050, 1054-56, 1059 (9th Cir. 2011) (vacating

23   decision to approve new highway and ferry terminal); *Nat'l Res. Def. Council v. Houston*, 146

24   F.3d 1118, 1129 (9th Cir. 1998) (vacating water service contracts). Thus any arguments by the

25   Intervenors of alleged economic harms to them from the vacating of their products' registrations

26

27   spring—those "concerns weigh toward leaving the listing rule in place while FWS remedies its

28   procedural error," *id.* at 1406, because having any listing decision was more protective than not

    having one.

should be rejected.

Second, even if the Court did consider as cognizable any such industry economic harm allegations, they are fatally undercut by a well-known fact in this litigation: this case, and its remedy, do not encompass all clothianidin and thiamethoxam products or other neonicotinoid pesticides. The chemical companies that sell these pesticides can still sell other similar pesticides, and farmers that use them will have other options. In fact, EPA and Intervenors strenuously argued against Plaintiffs' standing, unsuccessfully, for this very reason. *See* ECF No. 267 at 7 (arguing that even if the registrations were vacated, "earlier-registered products will remain registered for use on the same crops."); ECF No. 267-1 (EPA exhibit listing 57 products not included in the case).[14]

With regards to impacts on farmers specifically, any alleged disruptive consequence arguments are further undercut by the fact that, in the interests of equity to farmers, Plaintiffs here only seek prospective vacatur. That is, Plaintiffs request the Court vacate the registrations beginning from the date of its decision (or another date certain shortly thereafter). Thus farmers that have purchased products in reliance on their registration at issue can use those products, but not purchase new such products.

Finally, with regards to environmental consequences, as detailed above, it is well established that these pesticides pose risks to many endangered species. *See supra* pp. 3-9. Of course generally and in addition to endangered species, these controversial, systemic neonicotinoids are known to be tragically toxic to honey bees, wild bees, bumblebees, other pollinators, and beneficial insects, including butterflies, ladybugs, lacewings, and dragonflies.[15]

---

[14] In any event, as to the alleged economic benefit of the products, EPA itself has recognized that many of these seed coating products are unnecessarily overused, with no corresponding economic benefit to farmers. Myers, C and E Hill., *Memorandum: Benefits of Neonicotinoid Seed Treatments to Soybean Production*, EPA (Oct. 15, 2014), https://www.epa.gov/sites/ production/files/2014-10/documents/benefits_of_neonicotinoid_seed_treatments_to_soybean _production_2.pdf.

[15] Indeed, the harm to wildlife—including invertebrates, fish, birds, aquatic organisms, and bees—is spelled out on nearly every label for the fifty-nine products, with phrases like "this product is highly toxic to aquatic invertebrates" and "this pesticide is highly toxic to bees." *See* AR68424, AR66995, AR66961, AR67011, AR66944, AR66768, AR66796, AR68454,

1    When bees and other pollinators forage on neonicotinoid-treated crops' pollen or nectar, or are

2    otherwise exposed to extremely small doses of the compounds, paralysis and death result.

3    AR44375-401, AR75066 at 2. Chronic exposures likely have detrimental reproductive and

4    developmental effects. AR43631. Exposures affect bee behavior and cognition, compromising

5    colony health. AR44376-401, AR53509-10. As Plaintiff beekeepers have experienced firsthand,

6    neonicotinoids' proliferation has coincided with massive bee population die-offs in the

7    phenomenon known as Colony Collapse Disorder. AR44375-401, AR53509-10. Indeed, just in

8    the last year since the completion of Summary Judgment briefing the peer-reviewed literature

9    (including in *Science*, the most prestigious scientific journal) is replete with new, authoritative,

10   field-based studies demonstrating harms caused by clothianidin and thiamethoxam to honey

11   bees, bumble bees and other invertebrates.[16]

12         Accordingly the environmentally beneficial, protective result is to safeguard endangered

13   species, other species and the environment generally, by removing these pesticides known to be

14   harmful to them from the market. Vacatur will remove fifty-nine harmful pesticide products,

15   until and unless the Agency complies with the ESA. It will reduce the total number of pesticide

16   products, and as such, reduce risks to protected species from them.

---

17   AR68467, AR66719, AR66828, AR66678, AR67858, AR67405, AR68351, AR68642,
     AR67025, AR66629, AR67682, AR67211 (clothianidin products); AR65825, AR68493,
18   AR65012, AR67278, AR67982, AR66416, AR65203, AR67762, AR64474, AR67566,
     AR64613, AR66529, AR67304, AR65343, AR65436, AR65786-87, AR67423, AR68348,
19   AR64695, AR64198, AR65525, AR68088, AR64092, AR66100, AR67179, AR68185-86,
     AR64929, AR64499, AR64836, AR64318, AR65557, AR64776 (thiamethoxam products). Two
20   of the products explicitly state that they "may pose a risk to threatened and endangered species of
     fish, amphibians, crustaceans (including fresh water shrimp), and insects." AR65012, AR67179.
21

22   [16] *See e.g.*, C. H. Krupke et al., *Planting of Neonicotinoid-treated Maize Poses Risks for Honey
     Bees and Other Non-target Organisms Over a Wide Area Without Consistent Crop Yield Benefit*,
23   54 J. Applied Ecology 1449 (2017), https://goo.gl/hhfVJ6; E. A. D. Mitchell et al., *A Worldwide
     Survey of Neonicotinoids in Honey*, 358 Science 109 (2017), http://science.sciencemag.org/
24   content/358/6359/109.full; Olivier Samson-Roberts et al., *Planting of Neonicotinoid-coated
     Corn Raises Honey Bee Mortality and Sets Back Colony Development*, PeerJ (2017),
25   https://peerj.com/articles/3670/; B.A. Woodcock et al., *Country-specific Effects of Neonicotinoid
     Pesticides on Honey Bees and Wild Bees*, Science 356, 1393-1395 (2017), https://goo.gl/pvyE6x.
26   An earlier study also found that clothianidin is a threat to the iconic monarch butterfly. Jacob R.
     Pecanka & Jonathan G. Lundren, *Non-target Effects of Clothianidin on Monarch Butterflies*,
27   Science of Nature 102:19 ) (2015), https://goo.gl/92mua8.

28

1    That there are other similar pesticide products, other sources of pesticide pollution, that

2    will remain in use despite vacatur does not mean that it is somehow more environmentally

3    beneficial *not* to remove the pesticides that EPA unlawfully approved—that pose acknowledged

4    risks to protected and other beneficial species—from the market until EPA corrects its violations

5    of law. It is nearly always the case that there are other sources of harm or environmental

6    pollution, and often many sources of harm to protected species and their habitat; that does not

7    mean that courts should not remedy violations of law. Merely because vacatur will not solve all

8    of a problem, does not mean it will not help solve a problem. *See, e.g.*, *Massachusetts v. E.P.A*,

9    549 U.S. 497, 524 (2007) ("Agencies, like legislatures, do not generally resolve massive

10   problems in one fell regulatory swoop."); *Rocky Mt. Farmers Union v. Corey*, 740 F.3d 507, 511

11   (9th Cir. 2014) ("incremental change, when aggregated, can be significant" and it would be

12   "erroneous" to assume that an incremental step is not legally significant); *Church of Scientology*

13   *of California v. U.S.*, 506 U.S. 9, 13 (1992) (partial remedy keeps a case from being moot).

14   Indeed, even if substitute products were used, those pesticides need not be more harmful. There

15   are numerous other safer pesticides that could be substituted if needed, which—unlike the

16   products at issue in this case—are classified by EPA as "reduced risk."[17]

17   Moreover, even for those pesticides not specifically encompassed by this case, the

18   Court's decision, its remedy, and the ordered EPA process to come will create vital precedential

19   and practical guidance for the future regulation of those pesticides and what is lawful, under the

20   ESA and FIFRA. In other words, it will undoubtedly affect those other products indirectly. The

21   Court held similarly in the standing context, ECF No. 269 at 25, and the same is true here. Thus

22   it is difficult to see how EPA could in good faith with this Court's order continue simply to

23   approve substitute new clothianidin and thiamethoxam products without addressing the errors of

24   law the Court has now adjudicated.

25

26   [17] EPA, Reduced Risk and Organophosphate Alternative Decisions for Conventional Pesticides, https://www.epa.gov/pesticide-registration/reduced-risk-and-organophosphate-alternative-
27   decisions-conventional (last visited Oct. 9, 2017) (note that Reduced Risk pesticides are labeled "RR" in the Table therein, whereas a less-protective classification, Organophosphate Alternative
28   pesticides, are labeled "OP Alt.").

1    EPA and Intervenors will cite *Center for Biological Diversity v. EPA*, 861 F.3d 174 (D.C.

2    Cir. 2017), in which the D.C. Circuit recently held that EPA violated "section 7(a)(2) of the ESA

3    by registering CTP [a pesticide, cyantraniliprole] before making an effects determination or

4    consulting with the FWS or the NMFS." *Id.* at 188. Despite finding that violation, that court

5    declined to vacate the pesticide registration. The court applied the vacatur test, but heavily relied

6    on the fact that CTP was classified as a "reduced risk" pesticide, meaning it was more

7    environmentally friendly than alternatives. *Id.* at 189. On the other hand, other courts have

8    rejected that same argument and still vacated pesticide registrations even if they are classified as

9    reduced risk. *NRDC v. EPA*, 676 F. Supp. 2d 307, 314-15 (S.D.N.Y. 2009) (vacating pesticide

10   registration, rejecting substitution arguments). Notably, the pesticides in this case are *not*

11   classified by EPA as "reduced risk" pesticides. Regardless, the case is extra-circuit and the

12   leading Ninth Circuit cases all *have vacated* the pesticide registrations. *Pollinator Stewardship*

13   *Council*, 806 F.3d at 532–33; *NRDC*, 857 F.3d at 1042. Just as the Ninth Circuit held in

14   *Pollinator Stewardship Council*, leaving EPA's registrations "in place risks more potential

15   environmental harm than vacating." 806 F.3d at 532.

16   Finally, the "disruptive consequences" factor must be "weighed" against the first factor,

17   the "seriousness of the agency's errors," *Pollinator Stewardship Council*, 806 F.3d at 532, which

18   in this instance were particularly grave: The agency's errors here were longstanding and

19   multiple, for several dozen pesticides, over many years, in which the agency knowingly ignored

20   its ESA duties, refusing to make an ESA Section 7 determination despite acknowledging harm to

21   species, and all the while allowing these products to be sold and used all across the country. *See*

22   *supra*. They violated ESA's core standard, the consultation mandate, the very process Congress

23   intended to implement the ESA's substantive mandate, to ensure no jeopardy to the incalculable

24   worth of endangered species. The default is to vacate these products, and this is not one of those

25   rare cases where vacatur is not appropriate.

26

27

28

### III. ALTERNATIVELY THE COURT SHOULD REQUIRE EPA ACT BY DEADLINES AND RETAIN JURISDICTION TO OVERSEE COMPLIANCE.

Vacatur has the inherent advantage of giving EPA time to comply with the ESA, if it determines it has competing resource constraints, without these products still being on the market and spread into the environment. However, if the Court declines to declare that the "may affect" threshold is met and declines to vacate the products, Plaintiffs request that the Court require that EPA make the "may affect-no effect" determination and then begin consultation by a Court-ordered timeline 180 days from the Court's Order, and complete consultation in accordance with an expeditious timeline, with continuing deadlines, with the Court retaining jurisdiction to ensure timely completion.

"Ninth Circuit precedent expressly permits imposition of deadlines on the remand process." *Intertribal Sinkyone Wilderness Council v. NMFS*, No. 1:12-cv-00420 NJV, 2013 WL 8374150, at *2 (N.D. Cal. Nov. 26, 2013). Courts "retain jurisdiction after remand to oversee the agency's action in compliance with the court's directive" and may set deadlines for agency compliance. *See, e.g.*, *Nat'l Wildlife Fed. v. NMFS*, 524 F.3d 917, 937 (9th Cir. 2014) (noting courts' "discretionary authority to impose a deadline for remand proceedings" and finding as reasonable the district court's setting a final deadline for remand proceedings and setting of 90 days mandatory progress reports); *Arizona Elec. Power Coop. v. United States*, 816 F.2d 1366, 1376 (9th Cir.1987) (establishing a 60–day deadline for agency action on remand); *Nat. Resources Def. Council v. Evans*, 243 F. Supp. 2d 1046, 1047 (N.D. Cal. 2003) (compiling cases); *Center for Biological Diversity v. Brennan*, 571 F. Supp. 2d. 1105 (N.D. Cal. 2007) (setting deadline for agency to produce a scientific assessment and retaining jurisdiction *In re Consolidated Delta Smelt Cases*, No. 1:09-cv-0047 LJO BAM, 2013 WL 1455592, at *3, *10 (E.D. Cal. Apr. 9, 2013) (setting deadlines for further proceedings); *Washington Toxics Coalition v. EPA*, No. C01-132C, 2002 WL 34213031, *10-11 (W.D. Wash. July 2, 2002) (ordering EPA to "initiate and complete section 7(a)(2) consultation in accordance with the schedule" established by the Court, which included completing consultation for fifty-five different pesticide active ingredients [as opposed to two here] within three years).

Indeed, in *National Wildlife Federation*, the Ninth Circuit, in affirming the district court's

setting of a deadline and retaining jurisdiction as "reasonable" and "appropriate" and "clearly permissible" specifically relied on two facts shared here: the agency's prior conduct of delay and the involvement of listed species. *NWF*, 524 F.3d at 937. Both factors similarly support Plaintiffs here. *See also Intertribal Sinkyone Wilderness Council*, 2013 WL 8374150, at *2 (in establishing remand deadline and retaining jurisdiction, also relying on the fact that it was an ESA case, and the "need to ensure the protection of listed species intended by Congress in enacting the ESA," that the violations of the ESA were "fundamental aspects" of the ESA process).

## CONCLUSION

When crafting a remedy for violations of law, courts have the duty to vindicate the underlying purposes sought to be served by that statute. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542-43 (1987). Where, as here, the violated statute's purposes are protecting endangered species, the Court's disposition must focus on protecting endangered species and the environment. Permitting further delay, and further unilateral decision making by EPA without entering consultation would be contrary to that purpose. Remanding without vacating would vitiate that purpose. The ESA contains a "clear mandate that a comprehensive biological opinion … be completed *before* initiation of the agency action." *Conner v. Burford*, 848 F.2d 1441, 1455 (9th Cir. 1986) (emphasis added). Contrary to this mandate, the challenged fifty-nine pesticide approvals that must undergo ESA consultation have continued unabated for many years, and absent vacatur of the registrations, will continue unabated. For these reasons the Court should vacate the challenged pesticide approvals and remand them to EPA for further action consistent with the Court's opinion.

For the foregoing reasons, Plaintiffs respectfully request the Court grant and issue declaratory relief that EPA violated the ESA for the agency actions at issue because the evidence shows that these products "may affect" numerous endangered species, requiring consultation. The Court should then prospectively vacate and remand the fifty-nine product registrations until and unless the agency comes into compliance with the ESA and completes consultation.

1   DATED: October 9, 2017

2                                           /s/ George A. Kimbrell
                                            GEORGE A. KIMBRELL (*Pro Hac Vice*)
3                                           Center for Food Safety
                                            917 SW Oak St. Suite 300
4                                           Portland, Oregon 97205
                                            T: (971) 271-7372 / F: (971) 271-7374
5                                           Email: gkimbrell@centerforfoodsafety.org

6                                           PAIGE M. TOMASELLI (State Bar #237737)
                                            SYLVIA SHIH-YAU WU (State Bar #273549)
7                                           PETER T. JENKINS (*Pro Hac Vice*)
                                            Center for Food Safety
8                                           303 Sacramento Street, 2nd Floor
                                            San Francisco, CA 94111
9                                           T: (415) 826-2770 / F: (415) 826-0507
10                                          Emails: ptomaselli@centerforfoodsafety.org
                                                    swu@centerforfoodsafety.org
11                                                  pjenkins@centerforfoodsafety.org

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28